**ALLGOOD ELECTRIC CO., INC., Plaintiff,**

v.

**MARTIN K. EBY CONSTRUCTION COMPANY, INC.; Federal Insurance Company; and Fidelity & Deposit Company of Maryland, Defendants.**

*No. 5:93–cv–125–1 (WDO).*

United States District Court,
M.D. Georgia,
Macon Division.

April 3, 1997.

Robert Lee Crewdson, William H. Hughes, Jr., Atlanta, GA, Charles W. Byrd, John Douglas Christy, Perry, GA, for Allgood Elec. Co.

Ronald G. Robey, Atlanta, GA, for Martin K. Eby Const. Co., Inc., Federal Ins. Co., Fidelity and Deposit Co. of Maryland.

## ORDER

OWENS, District Judge.

This case is again before the court on defendants' second and third motions for summary judgment. Oral arguments were held on the pending motions on March 3, 1997. Based upon the oral arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order.

### I. Procedural history

On April 13, 1994, this court granted summary judgment for defendants on all claims except for plaintiff Allgood's claim for retainage due.[1] The order held that the completion certificate signed June 8, 1992, by Allgood's president, Gloria Alday, was unambiguous and barred any claims for damages other than the claim for retainage. On June 25, 1996, the Eleventh Circuit reversed the grant of summary judgment and remanded this case for further proceedings. *Allgood Electric Co. v. Martin K. Eby Construction Co.*, 85 F.3d 1547 (11th Cir.1996). The Court of Appeals held, citing *Lackey v.*

---

1. Plaintiff's retainage has now been paid.

*McDowell*, 262 Ga. 185, 415 S.E.2d 902 (1992), that the release contained in the completion certificate was invalid because Eby was not specifically named therein. The Court further ruled that certain waiver and release language in payment applications signed by Allgood released only the lien claims against the property. The Court of Appeals remanded this case for a determination whether certain letters sent by Allgood to Eby complied with the contractual notice requirements for delay and whether Allgood was able to calculate the value of any or all of its delay demands prior to the completion of construction. This court was also instructed to focus upon remand on the effect of language on the payment application forms which stated:

> I hereby certify that the work performed and the materials supplied to date, as shown on the above, represent the actual value of accomplishment under the terms of the contract (and all authorized changes thereto) between the undersigned and Martin K. Eby Construction Co., Inc., relating to the above referenced project.

## II. Background

### A. Contract provisions

Defendant Martin K. Eby Construction Co., Inc. was the prime contractor for the construction of the Dooly Correctional Institution in Unadilla, Georgia. The owner of the building project was Georgia Building Authority (Penal) ("GBA"). GBA subsequently assigned administration of the prime contract to the Georgia State Financing and Investment Commission ("GSFIC"). Defendants Federal Insurance Company and Fidelity & Deposit Company of Maryland were sureties and provided a payment bond for the project.

Article E–37 of the prime contract between GBA and Eby, contained the following terms:

THE SUBCONTRACTOR AGREES

(1) To be bound to the contractor by the *terms of the contract documents* and to assume toward the contractor all the obligations and responsibilities that the contractor by the aforesaid documents assumes toward the owner.

(2) To submit to the contractor applications for payment in such reasonable

time as to enable the contractor to apply for payment under Article E–24 of the general conditions.

(3) to make all claims for extras, for extensions of time (See Articles E–18 and E–36) or for damages to the contractor in the manner provided in the general conditions for like claims by the contractor upon the owner, except that the time for making claims for extra expense is one week.

Articles E–16(b) and (c) of the contract provided:

(b) *Damages.*—If either party to this contract should suffer damages in any manner because of any wrongful act or neglect of the other party or of anyone employed by the other party, then he shall be reimbursed by the other party for such damage. No claim of the contractor for damage shall be valid unless written notice thereof shall have been received by the owner by registered mail within 15 days after occurrence of the event on which the claim is based.

(c) *Protest.*—All references to arbitration are deleted from the contract documents. Decisions of the architect shall be rendered in all cases as provided for under the general conditions of the contract, but no decision of the architect shall deprive the owner or the contractor of any form of redress which may be available under the laws of the State of Georgia to contracting parties. Any decision of the architect shall be final and binding on the contractor in the absence of written notice of protest from the contractor received by the owner by registered mail within twelve days of the date of the decision of the architect.... The owner shall have twelve days from the date of receipt of a protest within which to investigate and make reply. There is no provision under the contract for execution of work "under protest."

Article E–37, subparagraph 5 of the contract required Eby:

to pay the subcontractor upon the payment of certificates issued under the schedule of

values described in Article E–24 of the general conditions the amount allowed [Eby] on account of the subcontractor's work

On January 29, 1990, Eby entered into a subcontract with Allgood to perform the electrical work on the project for the amount of $1,280,000.00. The term of the subcontract contract was 540 calendar days from Notice to Proceed Phase II. Allgood began work on the project in April of 1990. Because of delays, the time for completion of the project extended to 1,000 days. Allgood submitted twenty-eight applications for payment during the term of the contract or contract extensions. The last application, covering the period from 02/20/93 through 9/06/94, was dated September 6, 1994, and showed a total amount completed and stored of $1,415,-180.75.

The subcontract between Eby and Allgood contained the following provision:

SECTION 11. DELAYS. Subcontractor shall not be entitled to an adjustment in time or Subcontract price for delays or damages caused by the Owner and/or Architect–Engineer, inclement weather, strikes, or other delays or damages unless such price change or time extension is approved in writing by the Owner or its authorized representative. Any damages which Subcontractor alleges that the Owner, Architect–Engineer, Contractor, other Subcontractor, or any other party for whom Contractor may be liable has caused him or is causing him *must be filed in writing with the Contractor within ten (10) days from the commencement of the alleged damage* and a full accounting filed within ten (10) days after the extent of damage is known or the cause for damage ceases, whichever is the sooner; otherwise, any such claims will be considered void. [Emphasis added.]

The subcontract also contained a provision pertaining to the procedure for Allgood's obtaining progress payments:

Subcontractor shall ... submit on a form provided by the Contractor a Schedule of Values of the various parts of the subcontracted work divided in such manner as to facilitate progress payments.

\* \* \* \* \* \*

[T]he Subcontractor's Schedule of Values will become the basis for monthly Applications for Payment.

Allgood asserts that soon after it began work on the project it became apparent that Eby and Eby's other subcontractors were delaying and disrupting Allgood's work, resulting in Allgood having little or no work to do on some days and then being forced on other days to accelerate its work when other trades completed their preceding work. Allgood alleges that Eby required Allgood to move its labor forces, equipment and material to various locations around the multiple buildings of the project in a "hopscotch" fashion instead of allowing Allgood to work in the agreed-upon and most efficient manner. According to Allgood, the delays and the changes in sequencing drastically increased its costs on the project.

After a careful consideration of the record and the arguments of counsel, it is apparent that the proper focus for consideration of Eby's summary judgment motion is Section 11 of the subcontract relating to delays rather than the language on the payment application forms which Allgood utilized to obtain interim payments for its work. Because the provisions of Section 11 are determinative as to Allgood's claims for delay damages, it is not necessary to rule upon the effect of the language in the payment applications.

### B. Allgood's notice of claims for delay

Between September of 1990 and January of 1993 seven letters were written to Eby by or on behalf of Allgood. Allgood asserts that these letters complied with the notice provisions of the prime contract and Section 11 of the subcontract. Pertinent portions of the letters are set out below.

*First letter.* On September 25, 1990, Gloria Alday wrote to the attention of Mr. Charles Schultz at Eby's office in Wichita, Kansas, stating:

During the Project Manager's meeting on Thursday, September 20, 1990, the fact was established that the above mentioned project is approximately thirty days behind schedule. We feel that this is through no fault of ours and offer the following as explanation:

.... [Chart consisting of work areas where delays were located, dates work was scheduled to start, dates work actually started, and Allgood's reason for delay in each work area.]

Schedules and excavation completion not coordinated enough to assure proper progress or production. All of the coordination efforts seem to be directed toward areas for block masons to work. This does not progress electrical access to work area or electrical productivity.

I have instructed my superintendent, Mr. Peavy, to make every effort to cooperate with Mr. Trump and the other trades, but we must get to the point where we can be productive. We feel at this point that we take "one step forward and two steps back." We cannot make any money on this contract if it is not completed on time.

*Second letter.* Tim Morgan, Allgood's project manager, wrote to Mr. Schultz of Eby on November 18, 1990, stating:

As you know production at the prison has almost come to a complete stop. At our last project manager meeting on September 20, 1990 we discussed how the job was approximately 30 calendar days behind at that point. It has now been 60 days and we have not made up any of that lost time. In fact I believe that we are approximately an additional 15 to 20 days further behind schedule due to the masonry contractor leaving the project.

We have had to decrease our work force from 10 men to 3 men due to the fact that there is very little production at this time. We however feel that after the Thanksgiving holidays there will be a rapid acceleration on this project to try to get back on schedule. We want to make the point perfectly clear that we have no overtime figured on this project or the cost of having to decrease and increase our forces to make up for lost time. To continue will result in additional cost to the contractor. We however do not wish to take this route if it can be avoided.

*Third letter.* Attorney J. Hatcher Graham wrote Eby on behalf of Allgood on February 21, 1991, stating in his letter:

The job is presently some two months behind schedule. After a detailed review of the construction history, Allgood is as-

sured that none of the delays are the result of any actions of Allgood. Therefore, any excess costs caused by these delays will be charged to your company.

It is also noted that your company is some two months behind on making progress payments in accordance with the contract provisions. This action, in and of itself, is a breach of your contract with Allgood. The failure to make timely progress payments has increased the cost of performance to Allgood and will also be charged against your company.

*Fourth letter.* Gloria Alday wrote to Mark Hutton of Eby on October 11, 1991, stating:

According to amendment 3 of this contract, our contract should be over as of November 14, 1991. This is to put you on notice that we will be filing a claim for our extended overhead and any other cost that is directly attributable to the delay of this project. As I told you on the phone yesterday we want to work with you in every way possible to get this job completed, but we can only bear so much extra expense.

In response to Allgood's fourth letter Mark Hutton of Eby wrote a letter to Gloria Alday on October 18, 1991. The letter noted that Allgood had signed Amendment No. 4 extending the completion of the subcontract to 619 calendar days from the date of Notice to Proceed II, or January 7, 1991, and discussed claims Allgood had made for additional work and temporary lighting. The letter contained the following paragraph:

We understand your desire to pursue a claim for the extended overhead and cost attributable; however, we would note that the prime contract provisions, incorporated into your subcontract, are explicit in what are allowable costs and what actions you must take in order to pursue claims. So that you do not waste any valuable time, we would suggest that you research the General Condition Articles of the prime contract, located in the front of the specifications, before you proceed with such a claim. Our experience with the Georgia Building Authority has been that they are extremely strict in the adherence to the requirements of this document.

*Fifth letter.* On February 21, 1992, Gloria Alday wrote to Mark Hutton of Eby providing him in accordance with his request a figure of $806.49 per day for extended overhead and direct job cost for the Dooly County Correctional Institute. On March 4, 1992, Eby wrote its own letter to the GSFIC in which it made a claim for its own delays. Eby also submitted to the GSFIC costs per day for extended overhead expenses of the major subcontractors on the project, including Allgood's expenses of $806.49 per day, indicating that the subcontractors' costs per day "could be effected [sic] by this additional work."

*Sixth letter.* On August 7, 1992, Ms. Alday wrote a letter to Charles Schultz of Eby, stating:

> On February 21, 1992, we furnished Mark Hutton a breakdown in our extended overhead and direct job cost for the filing of a claim against the State of Georgia. Please allow in that claim for us a total of 265 days for the extension of the contract.

> We feel we will have no problem substantiating this with the documentation we have on hand. I have never seen a project that required over 600 Request for Clarification. I feel that the burden of this additional expense should fall back on Rosser and the State of Georgia. We will work with you in any way that we can to help you resolve this with the state.

> We realize that our contract is with you and that we must look to you to handle this for us. We have prepared a lengthy claim and will be available to discuss it with you and your attorneys at any time convenient to both parties.

*Seventh letter.* On January 20, 1993, attorney J. Hatcher Graham wrote to Roger Elmore, the project manager for Eby, stating:

> This is to inform you that Allgood makes formal claim against your company for the sum of Five Hundred and Sixty-two Thousand, One Hundred and Ninety-nine Dollars ($562,199.00), which includes profit and interest to date. A detailed analysis of the costs incurred will be provided to you for your analysis.

### III. Discussion

#### A. Summary judgment standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in favor of the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir.1995).

Under the first element, the issue must be genuine, and the factual dispute must be material to the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Materiality" is determined by reference to the substantive law that controls the case. *Id.; Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 590 (11th Cir.), *cert denied,* 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994). For a question of fact to be "genuine," the party opposing summary judgment " 'must do more than simply show that there is some metaphysical doubt as to the material facts,' " *Irby,* 44 F.3d at 953 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986))—the evidence must be of such a quality that "a reasonable jury could return a verdict for the nonmoving party.... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 248, 249–50, 106 S.Ct. at 2510, 2510–11. Only those doubts about facts that are reasonable must be resolved in favor of the nonmovant. *Irby,* 44 F.3d at 953 (citing *Browning v. Peyton,* 918 F.2d 1516, 1520 (11th Cir.1990)).

The second element—that the movant be entitled to judgment as a matter of law—is satisfied where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a party has moved for summary judgment and properly supported its motion, the burden

shifts to the nonmovant to create, through the evidentiary forms listed in Fed.R.Civ.P. 56(c), genuine issues of material fact necessitating a trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.

### B. Allgood's compliance with notice provisions

■ Because jurisdiction in this case was based on diversity of citizenship, the substantive law of Georgia controls. *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982); *Allgood Elec. Co. v. Martin K. Eby Const. Co.*, 85 F.3d at 1551. Georgia courts have held that provisions applicable to notice provisions must be reasonably construed. *Batson–Cook Company v. Loden & Company*, 129 Ga.App. 376, 199 S.E.2d 591 (1973). In *Batson–Cook* the Georgia Court of Appeals did not bar a claim for additional compensation even though the contractor's notice of intention to claim extra compensation under the contract stated only that its extra work would "in all probability" cost it additional money in labor and material. The court upheld the trial court's refusal to instruct the jury to find for the defendant unless they found the notice "clear, definite, explicit, and not ambiguous." *Id.*, 199 S.E.2d at 593.

Allgood asserts that under *Batson–Cook* and similar cases the letters to Eby constituted sufficient notice under the prime and subcontracts of its intention to assert claims for delay. Ms. Alday acknowledged in her deposition that the first letter of September 21, 1990, was not an attempt to make a claim against Eby at that time. Thus, the first attempt to put Eby on notice of a claim was the second letter of November 18, 1990. Defendants contend that this letter was not sufficient notice under the contract documents.

■ The determination of the sufficiency of notice generally turns upon whether the defendant had actual notice of the delays for which the plaintiff is seeking damages. *See State Hwy. Dept. v. Hall Paving Co.*, 127 Ga.App. 625, 629, 194 S.E.2d 493 (1972). However, the provisions of the prime contract required Allgood not only to provide notice of a claim but to do so within a certain time period—within fifteen (15) days "after occurrence of the event on which the claim is based." In addition, Section 11 of the subcontract required Allgood to file any delay claim *within ten (10) days from the commencement of the alleged damage* and a full accounting filed within ten (10) days after the extent of damage is known. Even assuming that the language in all seven of the letters contained language sufficient under Georgia law to satisfy the notice requirement, Allgood's notice under both the prime and subcontract was required to be timely.

Allgood complained that the project was replete with problems from the beginning. Terry Peavy, the project superintendent for Allgood, testified in his deposition:

Q. The delays, your [sic] going through the incidents in a chronological fashion. The first one I see is July 3 of 1990. Would this be the date that they started occurring, the delays and problems that Allgood experienced on the job?

A. No, we experienced delays and problems from the onset of the job.

Q. From, as they say the get-go?

A. Correct.

Q. From the time you get there?

A. Yes.

\* \* \* \* \* \*

Q. What about the sequence of work, was that also disrupted from the very beginning?

A. Yes, it was.

\* \* \* \* \* \*

Q. So from day two of the project you were being delayed and disrupted on the project by Eby?

A. That's my opinion, yes.

Nevertheless, Allgood's position is that the "delay" contemplated by the subcontract would not occur until the original or contractually adjusted contract completion date was reached. It contends that there could be no recovery for delays until after the contract completion date because there was no delay until that time. Allgood argues that the letter of November 18, 1990, simply informed Eby that the project was behind schedule and that Allgood would file a claim for any

delays that should occur after the contract completion date. According to Allgood, such notification was to allow Eby to take measures to avoid the potential delay by placing more people on the contract to accelerate its portion of the contract, or to order acceleration of the work and still finish the project within the contractually allotted time.

Both the testimony of Allgood's project superintendent and the language of the November 1990 letter, however, demonstrate that Allgood was aware that delays had occurred from the beginning of the project and was able to estimate the extent of the delay. The language of the November 1990 letter advises that the job was approximately 30 calendar days behind schedule on September 20, 1990, and that it "has now been 60 days and we have not made up any of that lost time. In fact I believe that we are approximately an additional 15 to 20 days further behind schedule due to the masonry contractor leaving the project." No reason is given for the fact that the first written notice of any claim for such delays was not submitted until six months had elapsed rather than within the periods of time contemplated by the prime and subcontracts. Nor does Allgood cite any authority for its definition of "delay" as a condition impossible to occur until completion of the entire contract term.

The fallacy of Allgood's definition of delay is more easily seen if it is assumed that Allgood was entitled to seek not monetary damages but rather an extension of time for performance of the contract. Such a situation existed in *Department of Transportation v. Fru-Con Construction Corporation,* 206 Ga.App. 821, 426 S.E.2d 905 (1992), in which the contractor was required to file a written request to the engineer within fifteen days for an extension of time if the normal progress of the work was delayed for reasons beyond the contractor's control. According to the argument advanced by Allgood, the contractor in such a situation could have waited until fifteen days past the conclusion of the contract term to request extensions of time in which to complete the various elements of work which had been subjected to delay. But just as the necessity for additional time to complete the contract was readily obvious to the contractor before the end of the initial completion date, Allgood's delays

in performance of its subcontract were also apparent from the beginning of the delay. Section 11 of the subcontract contemplates two phases: first, a notification at the beginning of the damage; and second, an accounting of costs incurred after the extent of the damage becomes known. Allgood's failure to comply with its contractual duty by timely notifying Eby of its claim for delay is a separate consideration from its ability to give a full accounting.

 Georgia law holds that the parties to a contract may modify the contract terms either by express subsequent or written agreement or by implication arising out of conduct which indicates a mutual departure from or disregard of the original terms of the contract. O.C.G.A. 13-4-4; *Marathon Oil v. Hollis,* 167 Ga.App. 48, 305 S.E.2d 864 (1983). Allgood argues that because Eby acknowledged Allgood's letters of claim and asked for a breakdown of Allgood's daily overhead costs Eby waived the strict notice provision and cannot now be heard to complain that it did not receive actual notice.

The cases Allgood cites to support its position are based on dissimilar facts. For example, in *Biltmore Construction Company v. Tri-State Electrical Contractors,* 137 Ga. App. 504, 224 S.E.2d 487 (1976), the Georgia court held that the evidence was sufficient to show that the general contractor, by ratifying oral instructions of the project superintendent, had waived its right to insist upon written change orders under the contract. In *E.C. Ernst, Inc. v. General Motors Corporation,* 482 F.2d 1047 (5th Cir.1973), the issue was not untimeliness but whether the notice of additional costs provided a sufficient accounting of the actual costs involved. The court held that it was an unreasonable interpretation of the delay provision in the contract to require continual updates as to the amount of the claim when the delay was a continuing one.

 In *Ballenger Corporation v. Dresco Mechanical Contractors, Inc.,* 156 Ga.App. 425, 274 S.E.2d 786 (1980), the court ruled that a jury question existed as to whether the contractor's permitting additional work to proceed without objection after it received actual notice of the subcontractor's extra ex-

pense constituted a waiver of the contractor's right to enforce strict compliance with the one-week notice requirement. *Ballenger,* 274 S.E.2d at 796. But in *Fru–Con,* 206 Ga.App. 821, 426 S.E.2d 905, 907–08 (1992), a case involving notice provision similar to that in Allgood's subcontract, the court held:

> DOT's mere knowledge that the graders had not timely completed their work is certainly not evidence that DOT waived the requirement that appellee, in turn, apply for an extension because it would need extra time to complete its own work. Indeed, in the absence of such a request by appellee, DOT was entitled to presume that appellee did not consider the delay in the grading work to be a ground for extending the time for completion of the bridges. If DOT's mere knowledge were sufficient, the provision requiring timely written request for an extension of time would be meaningless and superfluous.

Similarly, Eby's knowledge in the present case that there were problems with the scheduling of the project is not tantamount to knowledge that Allgood was incurring monetary damages or that Allgood intended to file a claim. In *APAC–Georgia, Inc. v. Department of Transportation,* 221 Ga.App. 604, 472 S.E.2d 97 (1996), the court held that material issues of fact precluded summary judgment concerning the contractor's failure to provide specific requests for extensions of time on ninety listed items of work. In *APAC–Georgia,* in contrast to the present case, the contractor had written over fifty letters to DOT personnel in a four-year period indicating the need for extensions as a result of "domino-effect" delays on the entire project. The court found material issues of fact concerning whether DOT's granting of time extensions and failure to charge contractual liquidated damages to APAC–Georgia for delays in completing the project constituted a waiver by DOT of the notice provision. *APAC–Georgia,* 472 S.E.2d at 99.

In the case sub judice there is insufficient evidence that Eby's affirmative acts could have caused Allgood to believe it was not necessary to provide notice of its claim for delay damages. The fact that Eby asked for a breakdown of Allgood's costs and notified the owner that Allgood and other subcontrac-

tors might be affected by delays in the project cannot be held to indicate a waiver by Eby of the contractual notice provisions. Eby's notification to Allgood in its letter of October 18, 1991, of the necessity to strictly comply with the provisions of the prime contract provides further support for the finding that Eby did not waive the notice provisions.

### C. Decisions by the architect

In paragraph 43 of the complaint Allgood asserts claims for extra work it did at Eby's direction. Three of these claims are for power to the security system, and surge arresters. These items were submitted to Eby, which submitted them to the architect for a decision and then transmitted the architect's decision to Allgood. Section E–16(c) of the prime contract provides that any decision of the architect shall be final and binding within twelve days unless there is written notice of protest. Under Georgia law an architect's decision as to matters he is authorized to determine are binding on the parties except in the case of fraud, bad faith, or failure to exercise honest judgment. *See Richards and Associates, Inc. v. Fidelity Sound, Inc.,* 137 Ga.App. 752, 224 S.E.2d 832 (1976).

Tim Morgan testified at his deposition:

Q. Did you know that if the architect made a decision which someone didn't like, they had to appeal that decision?

A. Yes.

Q. So you knew about that?

A. Yes.

Q. During the job?

A. Yes.

It is undisputed that Allgood failed to appeal the architect's decision as required by the contract. However, Allgood takes the position that these claims should not have gone to the architect in the first place. Allgood further claims that it was not required to appeal the decisions because the architect merely decided that the contract generally required the work to be done but never rendered a decision as to who had responsibility under the contract to perform the work. Additionally, Allgood asserts that Eby had an obligation to appeal the architect's decision on its behalf because it knew

that Allgood would disagree with the decision.

In the court's view Eby's submission of Allgood's claims for a decision by the architect was sufficient to notify Allgood of its duty under the prime contract to appeal from that decision if it was contrary to Allgood's position. Allgood cannot impose upon Eby the obligation to immediately protest any architect's decision on Allgood's behalf without the benefit of any directions or actions by Allgood. Because Section E–16(c) of the prime contract was incorporated into the subcontract, it was Allgood's responsibility to appeal from any decision it believed were adverse to its interests. Allgood's failure to appeal from the architect's decision on the three mentioned items precludes its claim against defendants for those items.

## IV. Conclusion

For the reasons stated hereinabove, defendants' motions for summary judgment are hereby **GRANTED**.