**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 28, 2014**

# In the Court of Appeals of Georgia

A13A2157. WESTERN SURETY COMPANY et al. v.
        DEPARTMENT OF TRANSPORTATION.

PHIPPS, Chief Judge.

In this construction contract dispute, Western Surety Company and Continental Casualty Company (the "Sureties") appeal from the trial court's grant of partial summary judgment to defendant State of Georgia Department of Transportation (the "DOT") on the Sureties' claims for breach of contract and violation of the Georgia Prompt Payment Act (the "PPA").[1] The Sureties contend that the trial court erred in entering partial summary judgment because there remain genuine issues of material fact. For the reasons set forth below, we disagree and affirm.

---

[1] OCGA § 13-11-1 et seq.

Summary judgment is warranted when the moving party shows that there is "no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."[2] A defendant may meet this burden by demonstrating that "the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case."[3] And when the moving party discharges this burden, "the nonmoving party cannot rest on its pleadings, but must point to specific evidence giving rise to a triable issue."[4] We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant.[5]

So viewed, the record shows that the DOT and Bruce Albea Contracting, Inc. ("BAC") entered into a construction contract (the "Contract") for work on roadway US 27 (the "Project"). The Sureties issued performance and payment bonds to the

---

[2] *Bd. of Commrs. of Putnam County v. Barefoot*, 313 Ga. App. 406, 408 (721 SE2d 612) (2011) (punctuation omitted).

[3] Id. (punctuation omitted).

[4] Id. (punctuation omitted).

[5] *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

DOT, as obligee. The completion date for the Project was originally March 31, 2007, but was extended to January 18, 2008.

After BAC entered into the Contract, it experienced an increase in material costs for the Project. As a consequence of the increase in material prices, particularly for asphalt and other petroleum-related products, BAC suffered financial difficulties. In December 2006, BAC notified the Sureties of the problem.

Rather than allow the Project to "grind to a halt," the Sureties provided funds to BAC between April and July of 2007. In exchange for their help with the Project, BAC provided the Sureties with a letter from BAC to DOT, dated April 18, 2007, stating that BAC could not perform the work and was voluntarily abandoning the Contract. The letter was received by DOT in late June 2007, and DOT placed BAC in default and directed the Sureties to take over the work on the Project.

On September 11, 2007, the Sureties sent two claim letters to the DOT. After a meeting, the DOT asked for additional information. The Sureties chose not to respond to the DOT's request and subsequently sued the DOT, setting forth three counts of breach of contract[6] and one count of violation of the PPA. The DOT moved

_____

[6] Although it does not appear that the Sureties were parties to the Contract, we have found that in a breach of contract action "a subrogee stepping into the shoes of [a government contractor], may rely upon the waiver of sovereign immunity that

3

for partial summary judgment on the Sureties' claims for: (i) compensation for price inflation incurred after March 31, 2007 (the "Original Completion Date") ("Count II"); (ii) compensation for price inflation incurred before the Original Completion Date ("Count III"); and (iii) violation of the PPA.[7] The trial court granted the DOT's motion for partial summary judgment. On appeal, the Sureties contend that the trial court erred in granting summary judgment on Count II and Count III because they did not waive their claims against the DOT by failing to strictly comply with the Contract's notice and claim provisions.[8] The Sureties also contend that the trial court erred by finding that they are barred from recovering attorney fees under the PPA.

---

applied to the government contractor." *State Dept. of Corrections v. Developers Sur. & Indem. Co.*, 324 Ga. App. 371, 376 (1) (750 SE2d 697) (2013) (Cert. granted *State Dept. of Corrections v. Developers Sur. & Indem. Co.*, 2014 Ga. LEXIS 207 (Mar. 3, 2014)).

[7] The DOT's motion for summary judgment did not encompass Count I of the Sureties' complaint, which set forth a claim for the alleged outstanding balance for work performed.

[8] Although we do not reach these issues, the Sureties also contend that the trial court erred to the extent it determined that supplementary agreements to the Contract acted as accords and satisfactions, to the extent it found utility-related delays were not compensable, and to the extent it found that the breach of contract claims were disguised equity claims. They acknowledge, however, that "the argument relative to notice would theoretically apply to all of the Sureties' claims."

1. The Sureties acknowledge that neither BAC nor the Sureties strictly followed the claim notice requirements set forth under the Contract, particularly Specification 105.13. Specification 105.13.B.9 provides:

> NOTICE OF POTENTIAL CLAIM: In any case in which the Contractor believes that it will be entitled to additional compensation, the Contractor shall notify the Engineer in writing of its intent to claim such additional compensation. Such notice shall be given in order that the Department can assess the situation, make an initial determination as to who is responsible, and institute appropriate changes or procedures to resolve the matter.
>
> a. Claims for Delay– The Department shall have no liability for any delay which occurred more than one week prior to the filing of such written notice. Failure of the Contractor to give such written notice in a timely fashion will be grounds for denial of the claim.
>
> b. All Other Claims Except Acceleration and Delay– If the Contractor does not file such written notice before beginning the work out of which such claim arises, then the Contractor hereby agrees that it shall have waived any additional compensation for that work and the Contractor shall have no claim thereto.[9]

---

[9] The damages which the Sureties claim appear to be primarily associated with delay. However, the Sureties' representative acknowledged that it was not clear whether claims for material price increases before the Original Completion Date were a "delay" or "other" claim for purposes of the Contract, although it "seemed more like

In submitting a claim, the Contractor is also required to provide certain information, as set forth in Specification 105.13.C, and to certify the claim, as required by Specification 105.13.D.

Further, under Specification 105.13.B.6.b, recoverable damages under the Contract include "[d]ocumented additional costs for materials." The parties also agreed under Specification 105.13.B.5, however, that "[c]ompliance with the provisions of this Subsection will be an essential condition precedent to any recovery of damages by the Contractor."

Parties to construction contracts are free to enter into claim notice requirements, and such provisions are "legal and binding on the parties in the absence of special circumstances," which may include waiver or estoppel.[10] Thus, we start with the premise that the Contract is enforceable and that the Sureties cannot recover on their claims for damages under Count II and Count III, absent special

_____

an . . . ['[]other[']" claim. Neither party suggests that the issues on appeal turn on this distinction.

[10] See, e.g., *State Highway Dept. v. Hewitt Contractor Co.*, 113 Ga. App. 685, 692 (149 SE2d 499) (1966) (finding enforceable contract provision requiring contractor to give notice of its intention to claim extra compensation before beginning the work on which the claim was based, and that if such notice was not given, the contractor agreed to waive the claim for extra compensation).

considerations. The Sureties argue that those considerations are present here, and that a jury could conclude that (i) the DOT waived strict compliance with Specification 105.13, (ii) BAC and the Sureties reasonably and substantially complied with the notice and claim procedures, (iii) the DOT had actual notice of BAC's and the Sureties' claims, and (iv) the DOT was not prejudiced by the lack of strict compliance. It follows, they contend, that it was error for the trial court to grant partial summary judgment to the DOT on Count II and Count III. We disagree.

(a) The Sureties contend that the DOT waived strict compliance with the notice and claims procedures under the Contract by actively encouraging disputes to be handled informally and by punishing those who followed the strict claims procedures, by granting extensions of the contract time, and by negotiating with the Sureties. In that respect, we have "recognized that a party to a contract may waive contractual provisions for his benefit."[11] And in the context of claim notice requirements, "[c]ourts will readily seize upon any fact or circumstance growing out of the conduct of the parties, tending to show a waiver of strict compliance, and will seek to avoid

_____

[11] *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 217 (4) (a) (707 SE2d 508) (2011) (citation and punctuation omitted).

7

the forfeiture and to leave the actual merits of the case open to investigation."[12]

However, "mere silence when there is no duty to speak, cannot constitute a waiver or estoppel."[13]

To show that the DOT had encouraged disputes to be pursued outside the parameters of the Contract, the Sureties point to evidence that before 2006 or 2007 the DOT had a general practice of discouraging contractors from filing notice of claims but then retrospectively considering requests for additional compensation.[14]

---

[12] *APAC-Ga. v. Dept. of Transp.*, 221 Ga. App. 604, 607 (2) (472 SE2d 97) (1996) (citation and punctuation omitted). Accord *State Hwy. Dept. v. Hall Paving Co.*, 127 Ga. App. 625, 629 (3) (194 SE2d 493) (1972).

[13] *Hewitt Contractor Co.*, 113 Ga. App. at 693 (2) (a) (finding that "[t]he duty was on the plaintiff contractor under the contract to give the initial notice of a claim for compensation before embarking on what it considered extra work and was not on the defendant Highway Department to inform the contractor that it was about to do extra work for which it must give notice and execute a supplemental agreement").

[14] The Sureties rely on an affidavit of an expert who had "experience in dealing with contractors performing" for the DOT and who averred that "[f]or many years" contractors were strongly discouraged by the DOT from filing a notice of claim. Rather, after the completion of a contract, the DOT "considered discussing requests for additional compensation in a retrospective manner." The expert noted, however, that the DOT had begun insisting on strict adherence with its notice requirements "[i]n 2006 and 2007" and contractors had not yet adjusted to "the more stringent [c]ontract adherence, yet the new willingness of [DOT] to review a claim."

We are unpersuaded that what the DOT did at other times, with other parties, under different contracts, is relevant here. Although the Sureties suggested to the trial court that the course of dealing was so universal as to become part of the Contract by implication, the applicable agreement is set forth in the express provisions of the Contract.[15]

The Sureties also point to evidence that BAC's principal, based on his experience with DOT on other projects, was reluctant to file any claim against the DOT. BAC's principal deposed that on another project, upon "issue[] [of] the word claim, [the DOT] immediately used my liquidated damages as leverage." The DOT's engineer on the Project also testified that as to another project he worked on with BAC's principal, it was "not an-out-of-question conversation" that he told BAC "we're not going to give you time if you are asking for both time and money." According to BAC's principal, in this case BAC and its supplier wanted to "work out an escalation agreement" with DOT, but wanted to "get the time extension first."

---

[15] See generally *Ramsey v. Langley*, 86 Ga. App. 544, 549 (4) (71 SE2d 863) (1952) ("There cannot be an express and implied contract for the same thing existing at the same time between the same parties. It is only when the parties themselves do not expressly agree, that the law interposes and raises a promise.").

While there is evidence that BAC was "afraid to ruffle the feathers" of the DOT by filing a claim, and that the DOT might react negatively if such a claim was made, the evidence tends to explain why the procedures for filing a claim under the Contract were intentionally not followed by BAC, not that the DOT waived any of the Contract provisions regarding the filing of claims.[16] Rather, "[t]here is no evidence that DOT . . . did *any affirmative act* which would lead [BAC] to believe that it was not necessary for it to give timely notice of a claim."[17]

The Sureties also point to the DOT's alleged practice of "waiting until the end of projects to consider time extensions," showing that in this instance the DOT considered and granted BAC's requests for time extensions in 2007, notwithstanding that the delays occurred in 2004, 2005, and 2006. Therefore, the Sureties argue, because the requests for extensions were sent more than one week after the delays and

---

[16] Compare *State Hwy. Dept. v. Wright Contracting Co.*, 107 Ga. App. 758, 764 (1) (131 SE2d 808) (1963) (custom and practice of Highway Department to allow supplemental agreements upon completion of extra work, and its direction to contractor to complete work without first securing an agreement, contrary to what was required in the contract, led contractor to assume that provision had been waived).

[17] *DOT v. Fru-Con Constr. Corp.*, 206 Ga. App. 821, 824 (2) (426 SE2d 905) (1992) (citation and punctuation omitted) (finding that in absence of a request of extension, DOT was entitled to presume that delay in grading work was not considered by the contractor to be a ground for extension of the contract).

were not in strict compliance with the notice requirements, there was evidence of waiver. The DOT shows, however, that extensions of contract time were not granted under the provisions at issue here.[18] Thus, we cannot agree with the Sureties that they have pointed to evidence that DOT thereby waived strict compliance with the claim notice requirements.

Last, the Sureties contend that the DOT waived strict compliance with the claim notice provisions by participating in settlement negotiations. However, the Sureties do not show that during any communications or discussions between the Sureties and the DOT, the DOT agreed or intimated that it would waive any of the Contract requirements. Even after the submission of the two September 11, 2007 claim letters, the DOT continued to request information and acts on the part of the Sureties which were consistent with an insistence of strict compliance with the terms of the Contract.

---

[18] Specification 105.13.B.9.a, which appears to be the provision relied on by the Sureties, provides in applicable part that "[t]he Department shall have no liability for any delay which occurred more than one week prior to the filing of such written notice." And "such written notice" refers to the required notice of a potential claim.

(b) The Sureties further contend that a jury could conclude that BAC and the Sureties reasonably complied with the notice and claims provision of the Contract. We disagree.

As a rule, "[a]ny notice requirement must be reasonably construed."[19] And substantial compliance with a notice provision may present an issue for the jury if "[t]he evidence . . . appears to be 'in the spirit' of the contract provision."[20]

Here, the two September 11, 2007 letters asserted claims by the Sureties against DOT for compensation for price escalations and damages under the Contract. Nevertheless, the letters were on their face untimely as to the majority of the claims set forth therein. As we noted supra, the parties had agreed under Specification 105.13.B.9 that "[t]he [DOT] shall have no liability for any delay which occurred more than one week prior to the filing of" the written notice of potential claim and that, as to other claims, "[i]f the Contractor does not file such written notice before

---

[19] *Rice v. Lost Mt. Homeowners Assoc.*, 269 Ga. App. 351, 355 (4) (604 SE2d 215) (2004).

[20] *Apac-Ga.*, 221 Ga. App. at 606 (2). See OCGA § 13-4-20 (providing that "[p]erformance, to be effectual, . . . must be substantially in compliance with the spirit and the letter of the contract . . . .").

12

beginning the work out of which such claim arises, then the Contractor hereby agrees that it shall have waived any additional compensation for that work."

After the DOT received the two claim letters, it asked the Sureties, consistent with the Specification 105.13.C for, among other things, "[a] copy of the 'Notice of Potential Claim' filed for each delay event or issue associated with claim." The Sureties did not respond to this request, and the Sureties' representative maintained in his deposition that they did not do so because the DOT "had their own project files" and because the DOT had adequate notice of the claims. On appeal, the Sureties point to informal discussions between BAC and the DOT and letters sent from BAC and the Sureties to the DOT and contend that they are sufficient to create an issue of material fact as to "whether BAC and the Sureties' efforts were 'in the spirit' of" the Contract's requirements. For example, the Sureties show that they sent the DOT a letter in July 2007 concerning price escalations, stating, "All rights and/or claims for increased compensation due to time extension(s) and/or escalation of oil and/or asphalt prices increases to [BAC] and/or [the Sureties] are reserved." But the Contract does not reasonably contemplate that a contractor may unilaterally "reserve" a

13

claim.[21] Further, while these communications might show that the Project had been delayed and was subject to material price escalations, and that BAC sought an agreement with DOT to provide relief, they did not alert DOT that there were any grounds for a claim. For example, with respect to damages arising out of delay, Specification 108.07.E provides, in pertinent part, "[i]f the Engineer finds that The Work was delayed because of conditions beyond the control and without the fault of the Contractor, he may extend the time for completion in such amount as the conditions justify." Thus, while a delay might be excusable, the Sureties do not show that the DOT was informed that the Sureties or BAC contemplated that the DOT was obligated to pay compensation for the delay, including damages for increased material costs. Rather, under Specification 105.13.B.2, the DOT "will be liable only for those delay damages caused by or arising from acts or omissions on the part of [DOT] which violate legal or contractual duties owed to the Contractor by [DOT]. The Contractor assumes the risk of damages from all other causes of delay." Thus, we conclude that none of the communications by BAC or the Sureties to the DOT before

---

[21] The DOT also responded to the reservation letter by pointing out that "any claims for additional compensation or other claims for adjustments need to be brought in accordance with the terms of the Contract," and directing the Sureties to the Contract specifications related thereto.

the September 11, 2007 claim letters reasonably or substantially complied with the requirement that timely notice of a claim be given to the DOT.

The September 11, 2007 claim letters were perhaps sufficient to provide reasonable notice of a claim to the extent the notice was not untimely. However, in addition to notice, the parties agreed as to the required contents of a claim, including the information to be provided thereby.[22] When the DOT requested that information in writing following the submission of the claim letters, the Sureties chose not to respond. According to the Sureties' representative, the DOT's letter was "a request for free discovery in litigation,"[23] and "an excuse for . . . nonpayment."[24] The DOT also shows that the Sureties intentionally declined to comply with Specifications 105.13.D regarding certification of the claim. The Sureties suggest that because the DOT had previously analyzed and granted requests for extensions in the Project

---

[22] The requirements of Specification 105.13.C are extensive, and include 12 categories of information and documentation.

[23] Specification 105.13.C provides, however, that the information submitted thereunder may be used in resolving "any litigation which might arise from the claim."

[24] The Contractor had agreed under the Contract terms, however, that as to Specification 105.13, "[w]henever the Contractor believes that it is or will be entitled to additional compensation, whether due to delay, extra work, breach of contract, or other causes, the Contractor shall follow the procedures set forth in this Sub-Section."

15

completion date that the information contemplated by Specification 105.13.C was not needed by the DOT. But the parties had not contemplated that the DOT would independently gather all the documentation needed to assess a claim, or that a contractor could assume that the information it was required to produce in connection with a claim was already present in the DOT's files. Given the foregoing, we cannot agree with the Sureties that a trier of fact could conclude that their efforts were "in the spirit" of the Contract.

(c) The Sureties further contend that a jury must decide whether the DOT had actual notice of BAC's and the Sureties' claims. They rely on *APAC-Ga. v. DOT*,[25] where we found that "[t]he key issue is whether the DOT had actual notice of the delays for which APAC seeks damages."[26] Here, the Sureties point out, DOT had notice of delays and even granted extensions for the delays. We find *APAC-Ga.* to be distinguishable.

At issue in *APAC-Ga.* was whether the trial court erred in finding that the contractor failed as a matter of law to comply with a provision regarding the

_____

[25] 221 Ga. App. 604 (472 SE2d 97) (1996).

[26] Id. at 606 (2).

16

extension of contract time.[27] And the evidence in that case showed that the contractor sent over 50 letters to DOT giving notice of delays and the need for extensions, and that DOT also granted extensions without request and failed to charge contractual liquidated damages for failure to complete the project on time.[28]

In this case, however, the DOT's knowledge "that there were problems with [delays] is not tantamount to knowledge that [BAC or the Sureties were] incurring monetary damages or that [they] intended to file a claim."[29] If compliance with the

_____

[27] In Division 1 of *APAC-Ga.* we found that then "provision 105.13" did not apply to the contractor's claim for delay damages. See *APAC-Ga.*, 221 Ga. App. at 604-605 (1). In Division 2, we found that "provision 108.07" did apply to the contractor's claim. *APAC-Ga.*, 221 Ga. App. at 605 (2). Provision 108.07 provided in part that "[i]f the normal progress of The Work is delayed for reasons beyond his control, the Contractor shall, with (sic) fifteen days after the start of such a delay, file a written request to the Engineer for an extension of time . . . ." Id. at 605-606 (2). Neither provision at issue in *APAC-Ga.* is the same as Specification 105.13, which is at issue here.

[28] See *APAC-Ga.*, 221 Ga. App. at 606 (2).

[29] *Allgood Elec. Co. v. Martin K. Eby Constr. Co.*, 959 F. Supp. 1573, 1581 (III) (B) (M. D. Ga.) (1997) (finding that, under Georgia law, there was insufficient evidence of affirmative acts by the contractor for its sub-contractor to have believed that it was not necessary to provide the contractor with notice of a claim for delay damages). Compare *DOT v. Dalton Paving & Constr.*, 227 Ga. App. 207, 216 (3) (489 SE2d 329) (1997) (jury could conclude that DOT waived notice requirements where, among other things, "DOT expressly acknowledged that appellee's . . . letter served as actual notice of appellee's intent to file a claim").

17

Contract could be deemed waived or excused because the DOT was aware of a delay or of price escalations, which, as to the latter, would often be public knowledge, then "the provision requiring timely written [notice of a potential claim] would be meaningless and superfluous."[30] Similarly, to the extent that DOT had actual knowledge of claims in light of the September 11, 2007 claims letters, that did not leave the Sureties free to ignore the remainder of Specification 105.13.

(d) Last, the Sureties argue that a jury should consider whether the DOT was prejudiced by BAC's and the Sureties' failure to strictly comply with the Contract's claim notice provisions. They acknowledge that "[n]o Georgia appellate court has made a determination whether prejudice is a necessary element to prevent waiver of strict compliance." Rather, they rely on decisions of the General Services Administration Board of Contract Appeals.[31] As the parties did not incorporate federal law under federal contract notice provisions into the Contract, we find that the authority relied on by the Sureties is not relevant or controlling.

---

[30] *Fru-Con*, 206 Ga. App. at 824 (2) (assessing contract provision requiring contractor give timely written request for extension of time against DOT's knowledge that there was a delay in grading work on the project).

[31] See, e.g., *Max Blau & Sons, Inc.*, 91-1 B. C. A. (CCH) P23,626 (1990 GSBCA LEXIS 748) (finding that formal notification will not bar a claim for equitable adjustment if the government is not prejudiced).

In light of the foregoing, we conclude that there remains no issue of material fact as to whether BAC's and the Sureties' failure to comply with the claim notice provisions of the Contract was waived by the DOT, whether BAC or the Sureties reasonably or substantially complied with those provisions, or whether their compliance was excused by the DOT's actual knowledge of a claim. It follows that the trial court did not err in granting partial summary judgment to the DOT on Claim II and Claim III.[32]

2. In Count IV of their complaint, the Sureties requested attorney fees and interest arising out of the DOT's alleged violation of the PPA. Specifically, the Sureties alleged that the DOT violated the PPA "by failing to pay the Sureties within 15 days of receipt of Voucher #58."[33] The Sureties claim that the trial court erred in granting partial summary judgment to the DOT on this count. We disagree.

---

[32] The Sureties' other claims of error as to Count II and Count III are moot.

[33] Under OCGA § 13-11-3, a contractor's performance under a contract and satisfaction of the conditions precedent to payment "entitles such person to payment from the party with whom he or she contracts." OCGA § 13-11-4 (a) provides: "When a contractor has performed in accordance with the provisions of a contract, the owner shall pay the contractor within 15 days of receipt by the owner or the owner's representative of any payment request based upon work completed or service provided under the contract."

It is undisputed that DOT's payment for Voucher 58 has been accepted by the Sureties. And OCGA § 13-11-7 provides that "[a]cceptance of progress payments or final payment shall release all claims for interest on said payments." Accordingly, the Sureties do not show that they have a claim for interest under the PPA with respect to the failure to timely pay Voucher 58.[34]

The Sureties argue that inasmuch as Voucher 58 was paid after the action to enforce a claim was instituted, the "Sureties are entitled to [attorney] fees incurred until the voucher was paid."[35] This assertion contradicts the complaint, which states that DOT's payment for Voucher 58 was received on January 15, 2008, before the complaint was filed on March 18, 2008. The affidavit which the Sureties reference as evidence of payment after the filing of the action simply states that DOT "paid and the Sureties accepted Voucher 58." As the record is inconsistent with the Sureties' theory of recovery as to attorney fees, and the PPA contemplates attorney fees in

---

[34] This issue is effectively conceded by the Sureties in their appellate brief.

[35] OCGA § 13-11-8 provides that "[i]n any action to enforce a claim under this chapter, the prevailing party is entitled to recover a reasonable fee for the services of its attorney including but not limited to trial and appeal and arbitration, in an amount to be determined by the court or the arbitrators, as the case may be."

actions to "enforce" a claim,[36] we find no error in the trial court's grant of summary judgment on this count.

*Judgment affirmed. Ellington, P. J., and Branch, J., concur.*

---

[36] Id.