A97A1222. DEPARTMENT OF TRANSPORTATION v. DALTON
PAVING & CONSTRUCTION, INC.
(489 SE2d 329)

ELDRIDGE, Judge.

Appellant, the Georgia Department of Transportation ("DOT"), challenges a jury verdict for appellee, Dalton Paving & Construction ("Dalton Paving"), in a highway construction contract dispute. In asserting 27 enumerations of error, DOT attempted to have this Court reexamine every aspect of this case, from the admissibility of evidence and the failure to give certain jury charges to the weight of evidence presented and the credibility of witnesses. Although this Court refuses to invade the province of the trial court and the jury by retrying the case in its entirety, we must, in an effort to fairly and effectively resolve the issues on appeal, review the sequence of events leading to the jury verdict for appellee.

The facts, viewed in a light most favorable to the jury's verdict, *Dept. of Transp. v. Blair*, 220 Ga. App. 342, 343 (469 SE2d 446) (1996), are as follows: in 1989, appellee Dalton Paving contracted with appellant DOT for the reconstruction of a state road (SR 146) as it passed under Interstate 75 in Catoosa County.

DOT began planning for the construction prior to 1987, and a Field Plan Review Inspection was conducted on March 6, 1987. The inspection report refers to potential problems with the grade change at Ramps B and C, in that the project required a four and one-half foot drop or "cut" in the grading, thereby impeding access to the ramps during construction, and that the bridge embankments did not allow sufficient width for an additional temporary lane to provide for traffic flow during the project. The DOT transportation engineer who prepared the inspection report presented three alternatives for

dealing with the problems, including (1) temporarily closing the interchange, (2) keeping a single lane open to two-way traffic and utilizing flagmen or traffic signals to direct traffic, or (3) staging construction so that two-way traffic is re-routed onto one side of the interchange while work is conducted on the other side, then switching sides. The engineer opined that the third alternative "would be the most hazardous of the alternatives . . . and the least recommended of the three alternates." Further, the inspection report recommended that "the contractor be provided *an opportunity* for a separate alternate at the Preconstruction Conference that would have to be approved by DOT from a variation of one of the above listed alternates." (Emphasis supplied.)

On August 1, 1989, DOT engineers recognized that the construction plan was still incomplete and that DOT "should clarify the staging of the construction of Ramps B, C, and D." Shortly thereafter, DOT solicited bids for the project, even though DOT had not provided the necessary clarification of the construction plan. Appellee acquired bid documents for the project, visited the site, and submitted a bid in the amount of $915,285.22, which was 95.8 percent of DOT's cost estimate of $955,207.50. DOT accepted appellee's bid on September 1, 1989.

A preconstruction conference was held on October 18, 1989 "for the purpose of discussing and familiarizing [all parties] with the various construction details" of the project. At the meeting, Tommy Patterson of Dalton Paving asked for clarification concerning the construction on Ramp B and the resultant grade changes, saying that "I have not found out any provisions for the ramps, as far as what to do with traffic." Mike Long, a DOT engineer, responded that Ramp B was the "only problem ramp we have on 146," and that Dalton Paving would have to do the construction "[i]n phases, you will have to maintain traffic there." When more questions were asked by Patterson, DOT turned off the tape recorder, so the discussion between the parties intentionally was unrecorded by DOT. However, when recorded discussion resumed, John Rakestraw, another DOT engineer, said that "the project has three phases of construction and the phases should be set up to handle it, if there should be some problems arise [sic] on the construction, then *it will have to be handled out there on construction* to keep the traffic flowing, is that pretty well what we said?" (Emphasis supplied.) Patterson responded, "Sounds wonderful," and the meeting was adjourned. Thus ended the preconstruction conference, wherein the contractor was supposed to have an "opportunity" to discuss a separate alternative.

On May 29, 1990, the Federal Highway Administration ("FHWA") conducted an intermediate inspection of the project and found the quality of the work to be "satisfactory." The inspection

report noted, however, that the "*stage construction plans do not provide staging requirements for construction of the ramp terminals.* The grades of all of the ramp terminals are being lowered when the grade for SR146 is lowered. A section of the ramp must be used to maintain traffic during each stage of construction. *There is not enough information on the traffic control plans to detail the sequence of operations to maintain traffic on the ramps and construct the ramps to the new grades. The contractor will be required to provide a traffic control plan that will detail the sequence of operations he will perform to complete the construction of the ramps.*" (Emphasis supplied.)

On June 4, 1990, appellee notified DOT that it would be "impossible" to construct the interchange around Ramp B according to the original DOT traffic control plan contained in the bid documents and upon which appellee had relied in submitting its bid. DOT responded that any changes to the original plan would be appellee's responsibility and asserted that appellee requested the revision to the traffic control plan due to appellee's error in construction of temporary pavement, asserting that appellee did not widen the pavement enough to accommodate the existing traffic control plans. DOT's position is further clarified in a July 26, 1990 FHWA inspection report, which states that DOT "informed the contractor that since the change is required due to an error on the part of the contractor that he is responsible for developing an acceptable traffic control plan and that he will be responsible for all the additional expense for the new traffic sequence."

Pursuant to these instructions, appellee submitted an alternate traffic control plan for DOT's approval on August 2, 1990. In this letter, appellee also notified DOT that, because of the "erroneous Georgia DOT traffic control plan," they had sustained "additional direct job expenses," and asked DOT to extend the time for completion of the project so that a "workable" traffic plan could be approved.

DOT considered appellee's proposed plan and, in an August 6, 1990 memo between DOT engineers, DOT noted that the "main problem to be addressed is Westbound traffic wanting to go South on I-75. The difference in grade (3′+) makes it difficult for [westbound lane] traffic to turn left." *No mention* was made of any purported mistake on the part of appellee in its alleged failure to pave the road to the appropriate width.

On August 10, 1990, appellee sent a letter to DOT, asserting that any alleged paving problem "can be easily corrected," and noting that DOT had previously inspected and accepted the paving. The same letter notified DOT that appellee continued to sustain additional direct job expenses due to the "erroneous GA DOT sequence of operations and traffic control plan," and that appellee "intends to claim compensation for said additional expenses." Further, they

noted that the "only reason" they submitted the proposed new traffic plan on August 2, 1990 was "because of your verbal threat to retain our monthly [payments]."

Having reached a virtual impasse, the parties met on August 15, 1990, to "work out a solution for staging traffic throughout Stages I, II, III so the project can be completed." According to DOT's own notes from that meeting, Felton Rutledge of DOT "re-defined the problem as being [the] grade connection [at] SR 146 & ramps 'B' & 'C' and said D.O.T.'s [traffic control] plan was a suggestion from D.O.T. Felton [Rutledge] also said that D.O.T. would review any proposal from D.P.C. [Dalton Paving] and if D.P.C. [Dalton Paving] chose to accept D.O.T.'s plan that it would be 'their' [Dalton Paving's] plan." DOT reiterated that the "*original plan was buildable* and that [the new DOT proposed] plan was merely an alternative to [the] original plan since [the] original plan was not followed from ramps 'B' & 'C' west. . . ." (Emphasis supplied.)

After discussing DOT's proposal, appellee asked DOT to put it in writing, but DOT refused, responding that it was appellee's responsibility to furnish a plan and that DOT was responsible only for reviewing it. At the end of the meeting, representatives of both sides agreed to proceed with the "DOT proposal."

On the same day, following the meeting and after reviewing the project site, DOT and FHWA officials met and "decided" on a traffic control plan, including the use of barricades, signs, and message boards. The officials then returned to the project site and "*explained [to appellee] what needed to be done*" regarding traffic control. (Emphasis supplied.)

In an inspection report dated August 29, 1990, the FHWA inspector referred to the August 15 meeting and the agreement regarding the revised traffic plan, and noted that "[t]his additional work may make these bid items overrun the bid quantity." A Supplemental Agreement executed between the parties provided appellee with $7,000 for two variable message boards, one of which was needed "on the West side of the project ahead of a temporary detour not shown on the plans but constructed by the contractor *to correct some staging problems that were not addressed on the [traffic control] plans.*" (Emphasis supplied.)

On November 5, 1991, appellee submitted a claim for additional compensation in the amount of $234,313 for the extra work associated with DOT's revised traffic control plan. The claim asserted that the "revised sequence under which Dalton was required to construct the Project disrupted Dalton's work and caused Dalton to incur substantial additional expenses. Had GDOT's original construction sequence been workable, Dalton could have performed the Project in accordance with its bid and avoided the disruptions which plagued

Dalton's construction of the Project and substantial additional expenses which Dalton actually incurred." DOT responded on November 12, 1991, noting that it would classify appellee's claim as a "delay" claim, and that the claim should be resubmitted to DOT in "strict compliance with the provisions of Section 105 . . . [with] detailed information in accordance with Section 105.13D1 a-j."[1]

On February 21, 1992, appellee submitted a "claim supplement," including business records and cost documentation, which, according to appellee, "reasonably complie[d] with the provisions of Section 105."

In a memo between DOT engineers, dated March 6, 1992, DOT summarized appellee's claims and noted that appellee's Stage 1 construction was not completed in accordance with DOT's project staging plans. However, with surprising candor, Felton Rutledge, the District Engineer for DOT, admitted that, "[g]ranted the project stageing [sic] plans are not specific and in fact are in all likleyhood [sic] 'unworkable' if not modified." Further, Rutledge admitted that "[a]s previously mentioned the [original] project traffic control and staging plans were not specific as to how to handle the required grade changes at the intersection of SR 146 and the acess [sic] ramps to and from I-75 in the west. . . . The problem of maintaining acess [sic] while lowering the grade through this area of the roadway *were* [sic] *not addressed.* The problem was in fact compounded by a plan crossover to be used on Stage 2 . . . used to bring the split traffic in the west bound lane of SR 146 back across the mainline to the south side of the roadway. . . . Here in [sic] lies the problem *both* with DPC's [appellee's] construction of Stage 1 and the weekness [sic] in the department[']s staging plans. [Appellee failed] to construct Stage 1 properly . . . but *no provisions were made* [in the DOT traffic plan] to handle the W.B. [westbound] traffic shift. . . . [This] *combination of problems* led to a 'Mexican standoff' between the department and [appellee]." (Emphasis supplied.) While the memo noted that Stage 2 was constructed out of the original plan's sequence and "probably did result in some additional costs to the contractor . . . this was the only area of the project affected and I find [appellee's] claim of $235,663 in damages to be ludricruss [sic]."

On February 22, 1993, one year after appellee submitted the claim supplement to DOT, the claim was reviewed by a DOT engineer, Benny Dunn. Dunn recommended that the claim for extra compensation be denied "due to [appellee's] failure to follow Section 105.13 of their project contract." However, Dunn recommended that

---

[1] Supplemental Specification § 105.13 sets out the process required to assert claims for adjustments and disputes. Subsection D.1 lists the required contents for delay claims.

DOT offer to pay appellee $10,466.29 in "good faith" for additional quantities not previously paid, if appellee would agree to discontinue its request for any additional compensation.

On March 29, 1993, DOT sent a "Final Acceptance" letter to appellee in which it stated that the project was completed on July 16, 1991, almost two years earlier. The letter noted that the DOT District Engineer would be authorized "to submit a final statement for payment of work done."

The next day, DOT notified appellee that its claim for additional compensation had been denied because it lacked both "substantive issues and for its failure to conform to the contract requirements." The aforementioned settlement offer of $10,466.29, plus $1,530 in delay damages, also was extended to appellee.

Appellee responded to the claim denial by asserting that its claim was not a delay claim, but was an extra work claim governed by § 105.13.C, and that it had "reasonably complied" with the notice and record-keeping requirements of that provision. Appellee rejected the DOT settlement offer.

The parties met on May 7, 1993, to discuss a separate, but related, dispute regarding unpaid quantities for construction materials; these unpaid items were first brought to DOT's attention two years previously. DOT noted that, if the extra work compensation claim dispute went to court, DOT "did not want to be in [a] position of holding legitimate pay items from the contractor." DOT refused to discuss the extra work claim at this meeting, but agreed to submit the dispute regarding the unpaid quantities claim to DOT for a decision on whether or not it would be paid. On June 4, 1993, the DOT State Highway Engineer denied appellee's claim for unpaid quantities, affirming that DOT's prior statement was correct. Appellee rejected the decision of the State Highway Engineer in a letter dated June 21, 1993, and refused to sign a release for this claim.

Appellee filed suit against DOT on June 27, 1993. A jury trial was conducted from March 4 through March 9, 1996. On March 9, 1996, the jury returned a verdict for appellee which awarded appellee $180,215.20 in compensatory damages, $31,751.10 in unpaid quantities, and $146,286.95 in attorney fees and costs. However, according to the verdict form completed by the jury, the jury based the award upon a finding that a "force account" existed between the parties to compensate appellee for its extra work on the project; the jury also indicated on the verdict form that prejudgment interest should not be awarded in this case.

Following the jury's verdict, the trial court entered judgment for appellee, awarding $180,215.20 in compensatory damages,

$129,754.96 in prejudgment interest,[2] and $146,286.95 in attorney fees and costs. The trial court also reduced the jury's award of unpaid quantities from $31,751.10 to $15,264.95, finding that the jury's award exceeded appellee's proof of unpaid quantities by $16,486.15.

DOT previously had moved for a directed verdict, which was denied; following the verdict, DOT timely moved for a new trial or a j.n.o.v., both of which the trial court denied. DOT timely appeals from the judgment below. *Held:*

In the first seven enumerations of error, DOT asserts that the trial court erred, on several grounds, in denying DOT's motion for directed verdict and motion for j.n.o.v.

"In determining whether the trial court erred by denying defendant's [motion] for a directed verdict and motion for judgment n.o.v., this court must view and resolve the evidence and any doubt or ambiguity in favor of the verdict. . . . A directed verdict and judgment n.o.v. [are] not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom[,] demands a certain verdict. . . . [Cit.]" *Dept. of Transp. v. Blair*, supra at 344-345 (1) (b).

1. DOT asserts that it was entitled to a directed verdict or j.n.o.v. on the issue of whether DOT breached its contract, because appellee knew or should have known that the construction plans did not provide for traffic control at Ramp B and, by submitting its bid, appellee agreed to perform under any conditions encountered in performing the contract.

The evidence presented showed that DOT's construction plans were incomplete regarding a traffic control plan for the ramps; DOT recognized this prior to soliciting bids; appellee performed a site inspection prior to preparing its bid in accordance with § 102.05 of the Standard Specifications;[3] appellee submitted a bid that was 95.8 percent of DOT's cost estimate for the project based upon DOT's construction plans in existence at that time; and appellee questioned the traffic control plans at the first opportunity following its successful bid, the preconstruction conference, and was told by DOT representatives that any problems that arose from the plans would be handled

---

[2] Pursuant to OCGA § 7-4-16 on the principal amount of $180,215.20 for four years at the annual rate of 18 percent, accruing from March 22, 1992.

[3] Standard Specification § 102.05 reads as follows: "Examination of Plans, Specifications, Special Provisions, and Site of the Work: The Bidder is expected to examine carefully the site of the proposed work, the Proposal, Plans, Specifications, Supplemental Specifications, Special Provisions and Contract forms before submitting a Proposal. The submission of a Proposal shall be considered prima facie evidence that the Bidder has made such examination and is satisfied as to the conditions to be encountered in performing the Work and as to the requirements of the Plans, Specifications, Supplemental Specifications, Special Provisions and Contract."

during construction. Further, DOT's own documents, and the FHWA inspection reports, raised serious questions as to whether or not DOT's traffic control plans for Ramp B were ever "workable."

Therefore, jury issues were presented as to whether or not DOT's original traffic control plans were defective or unworkable; whether appellee fulfilled its duty to inspect the site under § 102.05 prior to submitting its bid; whether or not appellee should have recognized, prior to submitting its bid, that DOT's plans were so flawed as to be unworkable; whether appellee should have known that the problems with DOT's plans would result in uncompensated extra work; and whether DOT waived its § 102.05 defense by agreeing to address any traffic control problems "during construction." See *Fincher v. Bergeron*, 193 Ga. App. 256, 259 (387 SE2d 371) (1989); see also *State Hwy. Dept. v. Hewitt Contracting Co.*, 113 Ga. App. 685, 691 (149 SE2d 499) (1966); *State Hwy. Dept. v. Wright Contracting Co.*, 107 Ga. App. 758, 762 (131 SE2d 808) (1963) (finding that the conditions encountered on the project were not "such that the contractor should have been expected to have anticipated in the exercise of reasonable diligence. The fact that the contract makes provisions for extra work necessitated by unforeseen conditions is evidence enough that not every condition is expected to be anticipated"). Therefore, DOT was not entitled to a directed verdict or j.n.o.v. on these issues.

2. DOT asserts that it was entitled to a directed verdict or j.n.o.v. because the contract between the parties required appellee, not DOT, to provide a traffic control plan. However, while the contract is clear that a traffic control plan is required prior to any changes in traffic on the highway,[4] the contract does not assign responsibility to the contractor for such plan.

In fact, the evidence showed that the Special Provisions of the contract, which supersede the Supplemental Specifications,[5] refer the contractor to DOT's "construction plans for details" of the "[s]tage construction including temporary lane shifts to maintain two-way traffic on S.R. 146." The evidence also indicated that DOT's construction plans included workable provisions for traffic control at Ramps A and D; DOT did not require appellee to submit a traffic control plan for Ramps A and D; DOT did not request a traffic control plan for Ramps B and C from appellee when appellee raised questions about the ramps at the preconstruction conference; and DOT promised to handle any traffic control problems during construction.

---

[4] Supplemental Specification § 150.01.E reads in part: "A Traffic Control Plan will be required prior to any changes in traffic on interstate and other controlled access highways. The Engineer may require a Traffic Control Plan on other projects at his discretion."

[5] Standard Specification § 105.04. Coordination of Plans, Specifications, Supplemental Specifications, and Special Provisions.

Further, even though appellee eventually submitted a revised traffic control plan for Ramps B and C following DOT's threat to withhold monthly payments, DOT rejected the proposed plan. The evidence showed that DOT then proposed a revised plan to appellee during the August 15, 1990 meeting; DOT insisted appellee adopt and perform the plan; and DOT representatives met with FWHA officials, "decided" on a traffic control plan, and then "explained [to appellee] what needed to be done." Under the circumstances, there are material issues of fact as to which party was obligated to present a traffic control plan. Accordingly, DOT was not entitled to a directed verdict or j.n.o.v. on this issue.

3. DOT next alleges that it was entitled to a directed verdict or j.n.o.v. because appellee failed to give notice under § 105.13.C[6] that it intended to claim compensation for extra work. However, " '[w]hile forfeitures [due to noncompliance with contract provisions] are not unlawful, the law does not favor them, and all ambiguities in a contract are to be resolved against their existence. (Cit.)' . . . [Cit.]" *APAC-Ga. v. Dept. of Transp.*, 221 Ga. App. 604, 605 (1) (472 SE2d 97) (1996). "Notice requirements must be reasonably construed. The key issue is whether DOT had actual notice of [appellee's claims]." (Citation omitted.) Id. at 606 (2).

The evidence in the case sub judice showed that appellee gave DOT notice on August 2, 1990 that they had incurred "additional direct job expenses" as a result of the "erroneous Georgia DOT traffic control plan." Further, appellee again notified DOT on August 10, 1990 that they intended to claim compensation for additional direct job expenses that resulted from DOT's "erroneous" sequence of operations and traffic control plan. Under the circumstances, the "evidence [that appellee] presented appears to be 'in the spirit' of the contract provision, presenting the factfinder with a question of whether that notice was sufficient to reasonably comply with [the contract provisions]. [Cit.]" Id.

Further, "[t]hese facts also present a jury issue as to whether DOT, through its conduct, waived the notice provisions [of the contract]. It is well recognized that a party to a contract may waive con-

---

[6] Supplemental Specification § 105.13.C reads as follows: "Other Claims: 1. In any case in which the Contractor believes that it will be entitled to additional compensation for reasons other than delay or acceleration, the Contractor shall notify the Engineer in writing of its intent to claim such additional compensation before beginning or proceeding further with the Work out of which such claim arises. If such notification is not given, then the Contractor hereby agrees that it shall have waived any additional compensation for that work and the Contractor shall have no claim thereto. 2. The liability of the Department for such claims shall be limited to those items of damages which are specifically identified as payable in connection with delay claims as set forth in Sub-Section 105.13.A.6. For such claims, the Department will have no liability for those items of damages identified as not payable in connection with delay claims as set forth in Sub-Section 105.13.A.8."

tractual provisions for his benefit. Courts will readily seize upon any fact or circumstance growing out of the conduct of the parties, tending to show a waiver of strict compliance, and will seek to avoid the forfeiture and to leave the actual merits of the case open to investigation." (Citations and punctuation omitted.) Id. at 607 (2).

In the case sub judice, the evidence indicates that DOT recognized that a problem existed which was impeding appellee from completing the project. In response, DOT called a meeting on August 15, 1990 "to work out a solution for staging traffic through stages I, II, III so the project can be completed from where it is now." Further, in November 1991, DOT expressly acknowledged that appellee's August 10, 1990 letter served as actual notice of appellee's intent to file a claim. From these facts, a jury could infer that DOT had received actual notice of a potential claim by appellee and thereby waived any further notice under § 105.13.C. Therefore, DOT was not entitled to a directed verdict or j.n.o.v. on this issue.

4. In the fourth enumeration of error, DOT alleges that the trial court erred in denying its motion for a directed verdict or j.n.o.v. on the issue of whether a "force account" existed between the parties, as DOT had not agreed to the creation of such account in writing, as required by Supplemental Specification § 104.03.

Standard Specification § 101.27 defines "Extra Work" as follows: "An item of work not provided for in the Contract as awarded but *found essential to the satisfactory completion* of the Contract within its intended scope." (Emphasis supplied.) See also § 104.04. Standard Specification § 101.28 then defines a "Force Account" as a "method of payment for Extra Work when a Supplemental Agreement is not arrived at between the Engineer and the Contractor." Further, Supplemental Specification § 104.03 provides that "[w]henever an alteration in character of work involves a *substantial change in the nature of the design or in the type of construction*, a Change Order covering such alteration *will* be issued. All work shall be performed as directed and in accordance with the Specifications. If the alteration *materially increases or decreases the cost* of the performance, a Supplemental Agreement acceptable to both parties *shall be executed* before work is started on such alteration, except that *in the absence of a Supplemental Agreement acceptable to both parties*, the Engineer may direct that the Work be done *either by Force Account or at existing Contract prices* subject to the provisions of Sub-Section 105.13. Any Force Account Agreement *must be in writing*, specifying the terms of payment, signed by the State Highway Engineer and agreed to in writing by the Contractor." (Emphasis supplied.) See also Supplemental Specification § 109.05.B; OCGA § 32-2-60 (c) (2). Thus, DOT, not the contractor, ultimately controlled the creation of a force account.

The evidence, viewed in the light most favorable to the verdict, indicates that DOT recognized that there were serious problems with its traffic control plans for Ramps B and C; DOT promised at the preconference meeting to address such problems during construction; appellee questioned the plans several times, asserting that they were unworkable as designed; such assertions eventually led to a meeting between the parties on August 15, 1990; the parties reached an agreement to utilize DOT's "suggestion" for traffic control under threat from DOT; such suggestion involved substantial changes from DOT's original traffic control plan; and, following the meeting, DOT representatives visited the site, decided on a traffic plan, and gave appellee specific directions on how to control traffic at the site. The evidence also indicated that DOT adamantly refused to put its own directive in writing, but insisted that, if appellee utilized DOT's "suggestion," the plan would become appellee's responsibility. Further, upon submitting its claim for additional compensation to DOT, appellee submitted daily cost records which were in substantial compliance with the requirements of Supplemental Specification § 105.13.D.2, and which complied with the directions issued by DOT on November 12, 1991, when it acknowledged appellee's claim for additional compensation.

Given DOT's acknowledgment of the problems with its original plans, and its verbal directive to appellee to make substantial changes in DOT's construction sequence to accommodate these problems, DOT was under a duty to act in good faith and to negotiate a Supplemental Agreement to address the cost of these changes. See §§ 101.28; 104.03, supra. Clearly, the changed plans involved "extra work" under the contract specifications, since it was a "substantial change" which "materially increase[d]" the cost of the project. See §§ 101.27; 104.03, supra; OCGA § 32-2-60 (c) (2). Lacking such agreement, appellee was faced with two undesirable choices: (1) either complete the project by making the changes as directed by DOT, even though DOT refused to issue a written directive or sign a written agreement or (2) attempt to construct the project as originally designed, which was not possible.

Under the circumstances, a jury question existed as to whether DOT waived the express provisions for the creation of a force account under the contract, so that DOT was not entitled to a directed verdict or j.n.o.v. on this issue. See OCGA § 13-4-23; *Consolidated Fed. Corp. v. Cain*, 195 Ga. App. 671, 672 (394 SE2d 605) (1990) (even if the contract requires "'a written change order before beginning work for which recovery is sought . . . where the parties by a course of conduct have departed from the terms of the contract and operated without prior written change orders, there may be a waiver, or oral variation of the provisions of the contract'"); *State Hwy. Dept. v. Wright*

*Contracting Co.*, supra at 762 (finding that the highway department waived contract provisions requiring a written agreement for extra work by directing the work to be performed without such agreement, after receiving notice that the contractor intended to claim compensation for the extra work); see generally *Taliafaro, Inc. v. Rose*, 220 Ga. App. 249, 250 (469 SE2d 246) (1996). Had DOT acted in good faith compliance with the contract, a force account would have been created.

We also find that, since there was some evidence that a force account existed between the parties, it was not error for the trial court to admit evidence supporting this theory of recovery. Further, there was no error in providing the jury a special verdict form which allowed the jury to base an award on a force account theory.

5. In the fifth enumeration of error, DOT asserts that it was entitled to a directed verdict or j.n.o.v. on the issue of attorney fees and costs of litigation, in that the contract between the parties clearly disallows such damages and because appellee submitted no evidence of bad faith on the part of DOT.

According to Supplemental Specification § 105.13.C.2, in pursuing a claim for compensation for extra work, the Contractor is limited to the damages listed in § 105.13.A.6, and DOT is not liable for the expenses listed in § 105.13.A.8, including "Attorneys fees, claims preparation expenses or costs of litigation." Supplemental Specification § 105.13.A.8.g.

However, this specification does not preclude a finding by the jury that the plaintiff/appellee is entitled to attorney fees and litigation costs when the defendant/appellant has acted in bad faith. OCGA § 13-6-11 allows such award "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. . . ." Further, whether or not the defendant/appellant acted in bad faith in its contractual relations is an issue for the jury to determine. *Jim Anderson & Co. v. ParTraining Corp.*, 216 Ga. App. 344, 346 (454 SE2d 210) (1995).

In the case sub judice, there was evidence of bad faith on the part of DOT in failing to accept responsibility for the defective traffic plans; threatening to withhold payments unless appellee submitted revised plans; attempting to blame appellee when the original plans proved unworkable; insisting that appellee adopt revised plans while refusing to put such directive in writing; and refusing to settle the claims of appellee in a timely manner. Therefore, DOT was not entitled to a directed verdict or j.n.o.v. on this issue. Further, it was not error to admit evidence regarding attorney fees; charge the jury on attorney fees; or present the jury with a special verdict form which specifically listed attorney fees as a possible award.

6. DOT also asserts that it was entitled to a directed verdict on

the issue of prejudgment interest because (1) the contract prohibited such interest; (2) the sum that was allegedly due under the contract was unliquidated; and (3) the jury found that prejudgment interest should not be allowed. The record shows that the trial court submitted to the jury a verdict form which specifically asked, inter alia, "Should prejudgment interest be awarded?" The jury responded in their verdict, "No." However, the trial court, in its judgment entered on the verdict 19 days later, found that the plaintiff/appellee was entitled to prejudgment interest as a matter of law under OCGA § 7-4-16. Therefore, the court computed interest on $180,215.20 at an annual rate of 18 percent interest, accruing from March 22, 1992, and awarded the appellee $129,754.96 in prejudgment interest.

(a) DOT points to Standard Specification § 109.08.B, which deems any disputed amounts to be unliquidated and which specifically waives appellee's right to interest thereon. However, in *Dept. of Transp. v. APAC-Ga.*, 217 Ga. App. 103, 106 (456 SE2d 668) (1995), this Court held that "[e]xculpatory clauses must be clear and unambiguous, they must be specific in what they purport to cover, and any ambiguity will be construed against the drafter of the instrument. In this case, Standard Specification [§] 109.08.B seeks to bar recovery of prejudgment interest for any sum claimed by the Contractor under the Contract or for any extra or additional work. The specification does not specifically bar the recovery of prejudgment interest on sums obtained for . . . *damages resulting from a breach of contract* on the part of DOT. . . . It is well settled that exculpatory clauses will not be applied to delays *or their causes not contemplated by the parties*. In this case, we cannot say as a matter of law that [Dalton Paving] and DOT ever contemplated that Standard Specification [§] 109.08.B. would be applicable to a breach of contract claim such as that advanced by [appellee]." (Citations and punctuation omitted; emphasis supplied.) Therefore, appellee did not waive its right to prejudgment interest.

(b) However, without deciding whether or not the contract at issue in the case sub judice comes within the ambit of OCGA § 7-4-16, we note that appellee would have been entitled to interest under that provision only if the underlying amount of damages is liquidated. *Typo-Repro Svcs. v. Bishop*, 188 Ga. App. 576, 579 (373 SE2d 758) (1988). "[A] claim is unliquidated when there is a bona fide contention as to the amount owing. A liquidated claim is an amount *certain* and *fixed*, either by the act and agreement of the parties or by operation of law; a sum which cannot be changed by the proof." (Citations and punctuation omitted; emphasis in original.) *Home Ins. Co. v. North River Ins. Co.*, 192 Ga. App. 551, 557 (4) (385 SE2d 736) (1989); see also *Rice v. State Farm Fire &c. Co.*, 208 Ga. App. 166, 172 (430 SE2d 75) (1993); *Ryan v. Progressive Retailer Publishing Co.*, 16

Ga. App. 83, 89-91 (84 SE 834) (1915). "Whether there was a bona fide dispute between the parties is ordinarily a question for the jury." Id. at 91 (3). This Court previously has determined that a dispute as to the final payment due the contractors precluded an award of prejudgment interest, since "[c]learly, the parties were never in agreement as to the total amount due." *Shepherd Constr. Co. v. State Hwy. Dept.*, 138 Ga. App. 252, 253 (1) (226 SE2d 79) (1976).

In the case sub judice, a bona fide dispute existed as to whether appellee was entitled to compensation for extra work performed and, if so, in what amount. The fact that the contract, in § 109.05, provided specific guidelines for *computation* of compensation under a force account theory does not liquidate appellee's claim, as there was conflicting evidence regarding appellee's entitlement to such compensation; the nature and amount of materials, labor, and other costs; and the necessity of such charges. As such, the jury was empowered to determine the amount of the award, if any, and "[i]t was only after entry of a judgment upon that verdict that the claim became liquidated." *Firemen's Ins. Co. v. Oliver*, 182 Ga. 212, 213 (184 SE 858) (1936); see also *B. G. Sanders & Assoc. v. Castellow*, 154 Ga. App. 433, 434 (268 SE2d 695) (1980); *Buck Creek Indus. v. Crutchfield & Co.*, 133 Ga. App. 80, 81 (210 SE2d 32) (1974).

As an unliquidated claim, whether or not to award prejudgment interest is a decision within the jury's discretion. See *Davis v. Carpenter*, 155 Ga. App. 301, 303 (270 SE2d 810) (1980), rev'd on other grounds, 247 Ga. 156 (274 SE2d 567) (1981); see also *Aston Mills v. Suntek Indus.*, 190 Ga. App. 217, 218 (378 SE2d 399) (1989). The jury in the case sub judice determined that no prejudgment interest should be awarded.

Therefore, the trial court erred in including prejudgment interest under OCGA § 7-4-16 in the final judgment; appellee was not entitled to prejudgment interest on the unliquidated damages; and DOT was entitled to a directed verdict or a j.n.o.v. on the issue of prejudgment interest.

7. In this enumeration, DOT asserts that the trial court erred in denying a directed verdict or j.n.o.v. as to the amount of disputed quantities due appellee, because appellee was bound by the determination of the State Highway Engineer, and appellee failed to show the State's Engineer acted fraudulently or in bad faith in arriving at that figure.

DOT refers to Standard Specification § 105.01, which reads, in part, that, "[t]he Engineer will determine the quantities of the several kinds of work performed and materials furnished which are to be paid for under the contract and his determination shall be final." In *State Hwy. Dept. v. MacDougald Constr. Co.*, 189 Ga. 490, 495 (6 SE 570) (1939), the Supreme Court upheld a similar contract

clause, finding that " '[i]t was the clear intention of the parties, as expressed in this contract, and such is its legal effect, that the engineer . . . should be the arbitrator to determine when the contract had been complied with by either party, and to adjust all disputes and differences between them under it, and his decision was to be conclusive upon them. . . . Their chosen arbitrator, by the express terms of their contract, was to determine all disputes and differences between them arising under it, without further recourse or appeal.' "

Therefore, since there was no evidence that the State Engineer acted fraudulently or in bad faith in determining the amount of unpaid quantities due appellee, we find that appellee was not entitled to additional compensation for unpaid quantities, and DOT was entitled to a directed verdict or j.n.o.v. on this issue.[7]

8. DOT asserts that the trial court erred in admitting certain evidence over DOT's objection. "In reviewing [these] enumeration[s] of error, we note at the outset that '(a)dmissibility of evidence is a matter which rests largely within the sound discretion of the trial court.' . . . [Cit.]" *Dept. of Transp. v. 2.953 Acres of Land*, 219 Ga. App. 45, 47 (1) (463 SE2d 912) (1995). Even "evidence of doubtful relevancy or competency should be admitted and its weight left to the jury." (Citations and punctuation omitted.) *Benton v. Chatham County*, 206 Ga. App. 285, 291 (5) (425 SE2d 317) (1992). Further, "where evidence is offered and objected to, if it is competent for any purpose, it is not erroneous to admit it." (Citation and punctuation omitted.) Id. Finally, " '[e]vidence which, in connection with other evidence, tends, however slightly, to prove, explain, or illustrate a fact, even though it is not sufficient, standing alone, to sustain a finding of such fact, is relevant, has probative value and is admissible as against objection as to its relevancy and probative value; doubt as to the latter should be resolved in favor of admission and against exclusion, sufficiency not being a test or condition of admissibility. (Cits.)' [Cits.]" *Dept. of Transp. v. Whitehead*, 169 Ga. App. 226, 231 (4) (312 SE2d 344) (1983), aff'd, 253 Ga. 150 (317 SE2d 542) (1984). Therefore, this Court will not interfere with the trial court's decision to admit evidence absent a finding of abuse of discretion.

(a) DOT first asserts that the trial court erred in admitting the entirety of appellee's claim letter, which DOT labels as "self-serving." This Court finds this argument without merit, since the claim letter at issue was required by the contract, to wit, "All claims must be submitted in writing, and must be sufficient in detail to enable the Engineer to ascertain the basis and the amount of each claim." Supple-

---

[7] Although appellee asserts that the Georgia Arbitration Code, OCGA § 9-9-1 et seq., supersedes this contract provision, the record does not indicate that this argument was raised in the court below. Therefore, it is waived.

mental Specification § 105.13.D. Since DOT argues that appellee's claim should be barred because it failed to follow proper procedures in submitting its claim, evidence that appellee, in fact, submitted the claim and the supporting documentation was relevant to the issue of appellee's compliance with the contract and their good faith efforts in attempting to resolve the dispute. As such, the letter was both relevant and probative. Cf. *Executive Constr. v. Geduldig*, 170 Ga. App. 560, 562 (317 SE2d 564) (1984) (claim letters at issue were not required under a contract between the parties); *Denton v. Etheridge*, 73 Ga. App. 221, 227-228 (36 SE2d 365) (1945) (the letter at issue, which was an offer to compromise, was inadmissible as misleading, argumentative, irrelevant, highly prejudicial, and of questionable validity).

Further, DOT objected to the letter solely because portions were "self-serving declarations." This objection is insufficient, since "[t]he general rule is that where a portion of the evidence offered is admissible and a portion inadmissible, an objection to the evidence as a whole which does not point out and limit itself to the objectionable part is not sufficient." *Employers Liability &c. Corp., Ltd. v. Sheftall*, 97 Ga. App. 398, 403 (3) (103 SE2d 143) (1958). Notably, an objection that evidence is "self-serving" does not describe an independent ground for excluding evidence; such assertion is merely ancillary to a proper, underlying objection that alleges the proponent's manufacturing of favorable evidence, i.e., hearsay. See *Swain v. C & S Bank of Albany*, 258 Ga. 547, 550 (372 SE2d 423) (1988); *Chrysler Motors Corp. v. Davis*, 226 Ga. 221, 225 (173 SE2d 691) (1970).

However, even if a hearsay objection had been made, the letter was admissible as evidence of appellee's attempt to comply with the contract requirements, not for proof of the statements contained therein, and as such, was original evidence, not hearsay. OCGA § 24-3-2. Pretermitting whether or not the letter may be deemed hearsay, the letter was admissible as a business record, pursuant to OCGA § 24-3-14 (b), since appellee was required to submit it to DOT under the contract. See *Kilgore v. Caldwell*, 152 Ga. App. 863 (264 SE2d 312) (1980); see also *Tucker v. Whitehead*, 155 Ga. App. 104, 105-106 (270 SE2d 317) (1980), overruled on other grounds, *Merrill Lynch &c. v. Zimmerman*, 248 Ga. 580, 581 (285 SE2d 181) (1981). In addition, the author of the letter, Tom Patterson, testified at trial, and DOT's counsel had the opportunity "to draw the jury's attention to [the letter's self-serving nature] through cross-examination of the witness and argument to the jury." *Swain v. C & S Bank of Albany*, supra at 550 (1); see also *Johnson v. State*, 265 Ga. 668, 669 (461 SE2d 209) (1995).

In summary, the self-serving nature of the letter does not render it per se inadmissible, but affects instead the weight of the evidence.

See id. at 669; *Swain v. C & S Bank of Albany*, supra at 550; *Whitehead v. Joiner*, 234 Ga. 457, 459 (216 SE2d 317) (1975). Therefore, we find no abuse of discretion in the trial court's decision to admit appellee's claim letter.

(b) DOT also asserts that it was error for the trial court to admit a letter from appellee to DOT because there was no evidence as to when the letter was mailed. However, the letter was authenticated by the sender, Tom Patterson of Dalton Paving, who testified that he wrote the letter, kept a file copy, and requested an employee to mail it on May 11, 1990, all in the ordinary course of business. Further, Patterson testified that he sent a duplicate copy to DOT on August 2, 1990, after "Mr. Adams [of DOT] had indicated to me that he had lost the previous letter." Based on this testimony, the enumeration is without merit.

(c) DOT asserts that the trial court erred in allowing appellee's expert to offer an opinion in response to an incomplete, inaccurate hypothetical question. However, the question was consistent with the evidence and was not incomplete or inaccurate. Therefore, we find this enumeration to be without merit.

9. DOT asserts that the trial court erred in giving certain instructions to the jury. "It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge was error." (Citation omitted.) *Stephens v. State*, 263 Ga. 789, 791 (4) (439 SE2d 478) (1994); *Jackson v. State*, 214 Ga. App. 683 (448 SE2d 763) (1994). Further, the court must consider whether the charge to the jury, read in its entirety, is "sufficiently clear to be understood by jurors of ordinary capacity and understanding." (Citations and punctuation omitted.) *All Risk Ins. Agency v. Belk*, 191 Ga. App. 576, 577 (2) (382 SE2d 361) (1989).

(a) DOT claims that the trial court erred in instructing the jury that ambiguous contract terms must be construed against the drafter, asserting that the terms were not ambiguous and, therefore, did not need to be construed. DOT also claims the jury instruction was confusing and misleading. However, by submitting this instruction to the jury, the trial court impliedly ruled that the terms of the contract were ambiguous and in conflict, so that parol evidence may be admitted to explain the terms and the parties' intent. Further, the charge was not misleading or confusing, was a correct statement of law, and was supported by the evidence presented; therefore, there was no error.

(b) DOT asserts as error the trial court's instruction to the jury that an oral agreement modifying a contract waives a writing requirement, asserting that there was no evidence to support the charge and that the charge was contrary to Georgia law. However, we find that there was evidence to support the charge, since it is undis-

puted that a subsequent agreement was reached regarding "revised" traffic control plans. Further, while Georgia law requires a writing for all DOT construction contracts, OCGA § 32-2-60 (a), it also provides that a supplemental written agreement *shall* be made "[w]henever an alteration materially increases or decreases the scope of the work specified in the contract." OCGA § 32-2-60 (c) (2). The evidence in the case sub judice supports a finding that DOT waived its defense under the requirement when it orally directed appellee to change the traffic control plans, but refused to commit such directive to writing. Therefore, there was no error in giving this instruction.

10. DOT also asserts as error the trial court's refusal to give the jury several requested instructions. In addressing this assertion, we note that "[w]here the charge given substantially covers the applicable principles, failure to give requested instructions in the exact language requested is not error." (Citation and punctuation omitted.) *Birge v. State*, 143 Ga. App. 632, 639 (239 SE2d 395) (1977). Although DOT cites to case law that purports to hold that the failure to give a requested instruction that is supported by evidence and is a correct statement of law is reversible error, review of these cases shows that the charges given to the jury, reviewed in their entirety, completely failed to present essential defenses or theories of recovery. See *McDevitt & Street Co. v. K-C Air Conditioning Svc.*, 203 Ga. App. 640, 647 (418 SE2d 87) (1992); *Smoky, Inc. v. McCray*, 196 Ga. App. 650, 655-657 (396 SE2d 794) (1990); *Pritchett v. Anding*, 168 Ga. App. 658, 663 (310 SE2d 267) (1983); *Tallman Pools of Ga. v. Fellner*, 160 Ga. App. 722, 723-724 (288 SE2d 46) (1981). Such is not the situation in the case sub judice.

(a) DOT cites as error the trial court's refusal to charge the jury that, under the contract, appellee's failure to notify DOT of its intention to seek additional compensation waives any right to such recovery. However, the contract was in evidence, the jury was specifically instructed that the parties were bound by the expressed terms therein, and the charge, as given, substantially covered the proposed instruction. See *Birge v. State*, supra. Therefore, there was no error in refusing to give this requested instruction.

(b) DOT asserts that the trial court erred in refusing to charge the jury that DOT does not warrant construction plans and specifications, so that plaintiff/appellee "must recover, if at all, under the contract and subject to the terms and requirements of the contract."

However, this instruction is a misstatement of the law, as it prevents a finding by the jury that DOT breached other duties or warranties under the contract, such as implied warranties of good faith and fair dealing. See *Dept. of Transp. v. APAC-Ga.*, supra at 105. As such, the instruction was inaccurate, confusing, and misleading.

Further, the case cited by DOT as the basis for this charge, *State*

*Hwy. Dept. v. Hewitt Contracting Co.*, supra at 690, addresses the absence of such warranty as a basis for preventing the plaintiff from recovering outside the contract under the principles of quantum meruit or by renouncing the contract for fraud or mistake; no such recovery was sought in the case sub judice. Finally, DOT failed to cite any evidence in the record that supports this jury charge.

A "request to charge itself must be correct, legal, apt, even perfect, and precisely adjusted to some principle involved in the case. If any portion of the request is inapt or incorrect, denial of the request is proper." (Citation, punctuation and emphasis omitted.) *Asbury v. Ga. World Congress Center*, 212 Ga. App. 628, 631 (4) (442 SE2d 822) (1994). Therefore, there was no error in the trial court's refusal to give this charge.

(c) DOT asserts that the trial court erred in refusing to instruct the jury regarding the contract requirements for traffic control. However, the proposed instruction covers only one of many provisions in the contract that address traffic control and attempts to limit the jury's consideration of DOT's duty regarding traffic control to that single provision. Further, the contract provision is ambiguous, in that it states that "[a] Traffic Control Plan will be required prior to any changes in traffic[,]" but does not indicate who is responsible for such plan. The proposed instruction then misstates the provision in asserting that "the contract goes on to instruct *the contractor* as to what information *he* shall include in a traffic control plan." (Emphasis supplied.) In fact, the cited provision clarifies what a plan shall include, *not* who is responsible for proposing such plan. As such, the instruction is inaccurate, confusing, and misleading. It was not error for the trial court to refuse to give this instruction.

(d) DOT asserts that the jury should have been instructed on the contract requirements pertaining to the Sequence of Operations. However, the jury was instructed that they must determine what terms and conditions of the contract, if any, existed between the parties, and that the parties were bound by such terms. As such, the charge as given, reviewed in its entirety, substantially covered the proposed charge. See *Birge v. State*, supra. The trial court did not commit error in its failure to give DOT's proposed charge.

(e) DOT asserts that the trial court erred in refusing to charge the jury regarding the requirements under the contract for establishing a force account. We find that the comprehensive charge, as given, substantially covered the proposed charge. Id. Therefore, there was no error.

11. All other enumerations not specifically addressed in this opinion were resolved or were found to be without merit.

In summary, we find that the trial court erred in failing to direct a verdict or granting a j.n.o.v. for the appellant on the issues of pre-

judgment interest and unpaid quantities. We reverse the judgment of the trial court on these issues only and affirm the judgment of $180,215.20 in damages and $146,286.95 in attorney fees for plaintiff/appellee.

*Judgment affirmed in part and reversed in part. Birdsong, P. J., and Ruffin, J., concur.*

DECIDED JUNE 17, 1997 —
RECONSIDERATIONS DENIED JULY 10, 1997 —

*Michael J. Bowers, Attorney General, Cathy A. Cox-Brakefield, Senior Assistant Attorney General, Lawson, Davis & Pickren, G. Thomas Davis, Winslow A. Ward III, Alison H. Price,* for appellant.

*Griffin, Cochrane & Marshall, Harry L. Griffin, Jr., John D. Marshall, Jr., William H. Parkman,* for appellee.