A97A2302. AMERICAN PETROLEUM PRODUCTS, INC. v. MOM AND POP STORES, INC.

(497 SE2d 616)

JOHNSON, Judge.

American Petroleum Products, Inc. ("American") filed suit against Mom and Pop Stores, Inc. ("Mom and Pop") for the balance due on an account. Mom and Pop counterclaimed, alleging fraud and seeking overcharges for freight, Florida pollution taxes and volume incentives. A jury awarded Mom and Pop $71,000. American appeals, and we affirm.

On October 26, 1988, Mom and Pop, a corporation which owns and operates convenience stores, entered into a dealer supply contract with Golden Isles Petroleum, Inc. ("Golden Isles"), a distributor of Amoco petroleum products, which obligated it to purchase all of its fuel needs from Golden Isles. The contract stated the fuel was to be priced on a cost plus a specified mark-up basis. The contract further stated that taxes and freight charges were to be added to the price. Golden Isles took the net Amoco price it paid for the fuel and added its mark-up according to the pricing policy, deducting allowances and credits due Mom and Pop under the contract and then adding "applicable" taxes and freight charges.

On January 1, 1991, American advised Mom and Pop it had purchased the Amoco franchise from Golden Isles and that "[t]here will be very few changes in the overall operation." Mom and Pop knew that the petroleum it received was being exported by American from the state of Florida.

Florida imposes three separate pollution taxes on petroleum produced within the state: (1) a water quality tax; (2) a coastal protection tax; and (3) an inland protection tax. The taxes are originally collected when the product is purchased at the refinery. However, an application can be made by the distributor for a refund of the water quality tax and inland protection tax if the product is ultimately exported from Florida. Mom and Pop was unaware of these pollution taxes and the refund procedure. In addition, while Florida law requires that any pollution taxes due are shown on an invoice relating to the wholesale transaction, the Florida pollution taxes were not shown on the invoices American sent to Mom and Pop.

Beginning in January 1991, American was being charged the three pollution taxes and passing this cost on to Mom and Pop as part of the purchase price. American began making monthly applications to Florida for refunds on two of the pollution taxes. It received its first refund in May 1992. American does not deny that it received refunds for pollution taxes which were included in the price of fuel charged to and paid by Mom and Pop. For the period of time American sold fuel to Mom and Pop and passed on the pollution taxes, it received refunds from Florida totaling nearly $144,000.

In April 1992, Mom and Pop discovered that it was losing money on its petroleum sales and asked American's representative why it was not making a profit. American provided Mom and Pop with a breakdown of its bills and paid Mom and Pop a "competitive allowance" for May and June 1992. The breakdown documents did not mention the Florida pollution taxes. In fact, the breakdown documents stated that American had sustained a loss as the result of giving Mom and Pop the allowance. However, American admitted at trial that it did make a profit on these months in the amount of the undisclosed pollution tax refunds.

Mom and Pop attempted to obtain Amoco invoices from American so it could compare American's actual cost of fuel to the prices being charged to Mom and Pop. American refused to produce or share the invoices it received from Amoco. The Amoco invoices for fuel sold to American contained an itemization of the pollution taxes. In December 1992, Mom and Pop began subscribing to a service which allowed it to check the daily price that Amoco was charging American. Mom and Pop concluded there were discrepancies between the prices American actually charged and the prices it should have charged. On February 11, 1993, Mom and Pop informed American that it was terminating the dealer supply contract.

Subsequently, Mom and Pop learned of the Florida pollution taxes and met with American regarding those taxes and the refund procedure. At the March 31, 1993 meeting, American admitted that it had been including refundable Florida pollution taxes in the price

of fuel. However, American stated that it had not obtained any refunds of the pollution taxes. In addition, an American document discovered by Mom and Pop after the meeting indicated that the first application for pollution tax refunds *would be* April 1993. It is undisputed that American had been filing for pollution tax refunds since January 1991 and had received $62,000 in refunds by the time of the March 31, 1993 meeting.

The parties agreed to try and negotiate another dealer supply contract with a new pricing policy which specifically addressed the issue of how the pollution taxes would be handled. From April 1993 through July 1993, the parties attempted to reach an agreement and Mom and Pop continued to accept and pay for petroleum from American.

In April 1993, Mom and Pop contacted the Florida Department of Revenue to learn how to apply for and obtain refunds for the pollution taxes. Mom and Pop then contacted American, informed it that only American could obtain the refunds and stated that American had to attach the Amoco invoices showing the pollution taxes had been paid to the application for refund that it sent to the Florida Department of Revenue. American complained that doing this would entail a lot of work and that it would have to find the Amoco invoices. When Mom and Pop offered to assist American in preparing the refund applications, American responded that it would not allow Mom and Pop to see the Amoco invoices. American stated that while it might be able to obtain the refunds for future purchases, it could not receive refunds for back purchases. Mom and Pop specifically asked if American had already applied for the refunds, and American stated that it had not.

On June 7, 1993, Mom and Pop again spoke with American in an effort to obtain refunds of the prior pollution taxes paid by Mom and Pop and to discuss a new dealer supply contract. When Mom and Pop asked American why the pollution taxes were not shown on its invoices, American's representative responded, "Well, I just don't want to show it on the invoice." Later that month, American informed Mom and Pop that it would apply for a refund of the pollution taxes already paid and reimburse Mom and Pop for the taxes paid if Mom and Pop would sign a long-term contract. American admitted that it routinely withheld returning refund money so it could coerce customers into signing long-term contracts.

On June 15, 1993, Mom and Pop wrote a letter advising American that it would be doing business with another Amoco franchise. Mom and Pop faxed the same letter to American on July 8, 1993, because American continued to call Mom and Pop's store managers to obtain gas inventory levels. American stated that as long as its signs were on Mom and Pop's property, it would not allow Mom and Pop to

receive gasoline from anyone else. Mom and Pop then instructed American to remove its signs, at which point American instructed Mom and Pop's new supplier not to deliver gasoline to the store.

In August 1993, Mom and Pop discovered from the Florida Department of Revenue that American had been receiving refunds since December 1991. As a result, Mom and Pop opened an escrow account and deposited an amount of money equal to the total invoices which American had rendered for fuel delivered from July 2, 1993 through July 8, 1993. American's deliveries during this period totaled approximately $71,000.

At trial, a certified public accountant in both Georgia and Florida agreed that regardless of whether the parties had a contract or not, the pollution taxes should not have been passed on to a dealer and then a rebate obtained and not given to the dealer. The expert also performed a comparative analysis of the prices for gasoline actually charged by American to Mom and Pop and the prices as they should have been computed pursuant to the dealer supply contract. The expert concluded that the total overcharges for the pollution taxes were $105,000 and the total for freight overcharges resulting from a ten percent volume discount from White's Fuel Oil to American was $5,000. Mom and Pop had also been overcharged $21,000 due to American's practice of rounding up pollution taxes. Finally, the expert found that Mom and Pop had been overcharged $15,000 due to American's failure to pass along volume incentives Mom and Pop was entitled to receive.

The evidence showed that the Florida pollution tax was not charged on fuel which American purchased from Amoco's Savannah, Georgia terminal and delivered to Mom and Pop, yet in at least one case American added an overcharge equal to the rate of the Florida pollution tax to Mom and Pop's fuel costs. Likewise, the tax was not imposed by Florida for fuel shipped in Amoco fuel trucks or by a subcontractor of Amoco, yet American charged Mom and Pop.

1. In its first enumeration of error, American contends the trial court erred in denying its motion for a partial directed verdict with regard to Mom and Pop's counterclaim for fraud. American argued that everyone is presumed to know the law and that Mom and Pop's president and bookkeeper admitted that if they had known the Florida tax law, they would have made further inquiry and would not have been misled. However, the record shows that Mom and Pop's president and bookkeeper actually stated that they would have made further inquiry if they had known they were being charged the Florida pollution taxes.

"Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of

the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of [American's] motion for directed verdict . . . will not be disturbed." (Citations and punctuation omitted.) *John Crane, Inc. v. Wommack*, 227 Ga. App. 538 (2) (489 SE2d 527) (1997).

American did not, as the Florida statute specifies, separately state the amount of the pollution taxes paid on the invoices it sent to Mom and Pop. In addition, evidence established that American specifically informed Mom and Pop it had not applied for or received any refunds for pollution taxes paid when, in fact, it had already received a substantial amount in refunds. American's failure to disclose the tax did not constitute a misrepresentation of the law, but a concealment of the fact that the tax was included in Mom and Pop's cost and that it was being passed on to Mom and Pop. Thus, even if Mom and Pop was aware of the Florida tax law, a jury could have found that American fraudulently concealed or misrepresented that it was secretly passing along the pollution taxes it paid to Mom and Pop and then collecting the refunds, thus obtaining a profit equal to the amount of pollution taxes it added to Mom and Pop's fuel charge. Mom and Pop's knowledge of the pollution tax law would have made no difference unless the tax had been disclosed on the invoice so that Mom and Pop could then inquire about refunds or credits.

Moreover, the evidence showed that the Florida pollution tax did not apply to fuel which American purchased from Amoco's Savannah, Georgia terminal and delivered to Mom and Pop. Yet, in at least one case, American added an overcharge equal to the rate of the Florida pollution tax to Mom and Pop's fuel cost. Likewise, the tax was not imposed by Florida for fuel shipped in Amoco fuel trucks or by a subcontractor of Amoco, yet American charged Mom and Pop the pollution taxes.

"Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." OCGA § 23-2-53. Furthermore, "concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded." (Citation, punctuation and emphasis omitted.) *Southern Store &c. Co. v. Maddox*, 195 Ga. App. 2, 3 (1) (392 SE2d 268) (1990). The evidence showed that on at least one occasion Mom and Pop asked American if it had already filed for pollution tax refunds, and American responded that it had not when, in fact, it had already received refunds. In the present case, a jury was authorized to conclude that American suppressed

and concealed the fact of the pollution tax under the particular circumstances of this case. Such suppression constitutes actionable fraud. The trial court did not err in denying American's motion for directed verdict on this issue.

2. American also asserts Mom and Pop's counterclaim for fraud should have been dismissed because Mom and Pop failed to exercise due diligence to verify the components of American's price when it discovered it was losing money on petroleum sales. We disagree. "Questions of fraud, the truth and materiality of representations made by a defendant, and whether the plaintiff could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury. [Cits.]" *Brown v. Techdata Corp.*, 238 Ga. 622, 625 (234 SE2d 787) (1977).

The evidence showed that when Mom and Pop discovered it was losing money on the sale of gasoline, it requested cost data and invoices from American. These requests began in April 1992 and continued through June 1993. It is undisputed that American's invoices, contrary to the Florida statute, did not specifically set out the pollution taxes paid by American. In addition, Mom and Pop requested the invoices sent by Amoco to American so it could compare the amount Amoco charged American with the amount American charged Mom and Pop, but its requests were refused. Without the Amoco invoices or access to Amoco's prices, Mom and Pop could not judge the accuracy of American's billing.

In order to obtain Amoco price data, Mom and Pop subscribed to a reporting service in December 1992. It then discovered the discrepancies between the amount American should have been charging Mom and Pop and the amount it actually charged. In February 1993, Mom and Pop sought the assistance of another Amoco franchise to determine the cause of the pricing discrepancy it discovered. When Mom and Pop learned of the pollution tax as a possible source of the overcharge, it immediately called the Florida Department of Revenue to obtain more information about the tax and met with American about the tax. While American admitted it was passing the pollution tax on to Mom and Pop, it denied filing for or receiving pollution tax refunds. It was not until receipt of a Florida Department of Revenue official's letter dated August 5, 1993 that Mom and Pop learned that American had, in fact, filed for and received pollution tax refunds since December 1991.

"While a party must exercise reasonable diligence to protect himself against the fraud of another, he is not bound to exhaust all means at his command to ascertain the truth before relying upon the representations. Ordinarily the question whether the complaining party could ascertain the falsity of the representations by proper diligence is for determination by the jury." (Citations and punctuation

omitted.) *Bennett v. D. L. Claborn Buick,* 202 Ga. App. 308, 309-310 (2) (414 SE2d 12) (1991). The above facts were more than sufficient for a jury to conclude that Mom and Pop exercised due diligence, and a directed verdict on the issue of fraud would not have been proper.

3. The trial court did not err in denying American's motion in limine to exclude evidence of American's overcharges after March 31, 1993. "By its very nature, the grant of a motion in limine excluding evidence suggests that there is no circumstance under which the evidence under scrutiny is likely to be admissible at trial. [Cit.] In light of that absolute, the grant of a motion in limine excluding evidence is a judicial power which must be exercised with great care." *Andrews v. Wilbanks,* 265 Ga. 555, 556 (458 SE2d 817) (1995). Furthermore, the "[a]dmission of evidence is within the sound discretion of the trial court and appellate courts will not interfere absent abuse of that discretion. Evidence having a tendency to establish facts in issue is relevant and admissible, and no matter how slight the probative value, our law favors admission of relevant evidence." (Citations and punctuation omitted.) *Martin v. Williams,* 215 Ga. App. 649, 651 (3) (451 SE2d 822) (1994).

While Mom and Pop knew as of March 31, 1993 that American charged it the pollution taxes, American still denied that the refunds had been or could be obtained. It was not until August 5, 1993, when Mom and Pop received the Florida Department of Revenue letter, that it realized American had been applying for and receiving pollution tax refunds since December 1991. In addition, there was further evidence submitted that during the spring and into the summer of 1993, American was attempting to use its ability to apply for refunds to coerce Mom and Pop into signing a long-term contract. Thus, the jury could reasonably have concluded that American continued and furthered its scheme to defraud Mom and Pop even after March 31, 1993.

In addition, Mom and Pop counterclaimed for unjust enrichment, and this claim was charged to the jury. Since American admitted at trial that the pollution tax refunds belonged to Mom and Pop, evidence of overcharges after March 31, 1993 would have been relevant to this cause of action. It is not erroneous to admit evidence which is competent for any purpose. *Dept. of Transp. v. Dalton Paving &c.,* 227 Ga. App. 207, 221 (8) (489 SE2d 329) (1997). We find no abuse of discretion in the trial court's decision to admit evidence of American's overcharges after March 31, 1993.

4. The jury verdict was not inconsistent and void. "Verdicts shall have a reasonable intendment and shall receive a reasonable construction. They shall not be avoided unless from necessity." OCGA § 9-12-4. "The verdict may be construed in the light of the pleadings, the issues made by the evidence and the charge. The presumptions

are in favor of the validity of verdicts, and if possible a construction will be given which will uphold them. Even if the verdict is ambiguous and susceptible of two constructions, one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied." (Citations and punctuation omitted.) *Harrison v. Martin*, 213 Ga. App. 337, 344 (1) (444 SE2d 618) (1994); see *Southeastern Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 164 (1) (e) (473 SE2d 256) (1996).

The pleadings and evidence in the case show that American sought to recover $71,000 for gasoline sold to Mom and Pop. Mom and Pop sought to recover damages totaling $147,000, of which $5,000 represented damages for freight discounts not passed on to Mom and Pop.

The jury returned a general verdict in favor of Mom and Pop in the amount of $71,000. The verdict stated, "We, the Jury find as follows: As to the [sic] Defendant, Mom and Pop Stores, Inc.'s counterclaim, we find in favor [of] the Defendant, Mom and Pop Stores, Inc., and against the Plaintiff, American Petroleum Products, Inc. in the total amount of $71,026.69. This award represents $0 in damages; $0 in attorneys fees and cost of litigation." The verdict form included the word *"OR"* between the first part of the verdict form, relating to American's recovery, and the second part of the verdict form, relating to Mom and Pop's recovery, and the jury crossed out the first part of the verdict form.

After American objected to the verdict, the trial court questioned the foreperson regarding the jury's intent. The foreperson explained that the jury found that both parties had committed fraud, but that he did not know how to fill out the form. The foreperson further explained that the jury intended for Mom and Pop to recover the amount specified and that in making the award, the jury took into consideration American's claim regarding the value of the gasoline.

After questioning the foreperson, the trial judge asked both attorneys if they now understood the verdict. Both attorneys stated they did, and no further objection was made to the verdict form. The verdict was then received by the trial court and made the judgment of the court. The jury reasonably could have concluded based on the evidence presented that Mom and Pop was entitled to recover the total amount of damages it sought, less the value of the fuel for which it had not paid and less the freight discounts it sought. "We will not substitute our judgment based upon a cold record for that of enlightened jurors who heard the evidence and saw the witnesses. [Cit.]" *Efstathiou v. Reiss*, 227 Ga. App. 735, 738 (5) (490 SE2d 426) (1997). The trial court did not err in entering a judgment based on the jury's verdict.

*Judgment affirmed. Pope, P. J., and Blackburn, J., concur.*

DECIDED MARCH 6, 1998.

*Henderson & Henderson, Michael P. Ludwiczak,* for appellant.
*Smith & Floyd, Terry K. Floyd,* for appellee.